21-2737(L)

# In the
# United States Court of Appeals
# for the Second Circuit

———————

August Term 2024

Nos. 21-2737(L), 24-274(Con)

Arnold Schneiderman, AKA Moshe Schneiderman,
*Plaintiff-Appellant*,

v.

The American Chemical Society,
*Defendant-Appellee.*[*]

———————

On Appeal from the United States District Court
for the Eastern District of New York

———————

Argued: May 5, 2025

Decided: April 6, 2026

———————

Before: Raggi, Menashi, and Merriam, *Circuit Judges*.

———————

Plaintiff, a citizen of New York, invoked diversity jurisdiction to sue defendant, a federally chartered corporation with its principal place of business in

———————

[*] The Clerk of Court is respectfully directed to amend the official case caption as set forth above.

Washington, D.C., for disability discrimination in violation of New York State law. Plaintiff now appeals from (1) a judgment of the United States District Court for the Eastern District of New York (Mauskopf, *J.*) dismissing his action for lack of subject matter jurisdiction, and (2) a subsequent order of the same court declining to reconsider that judgment and to reopen the case for further discovery as to a possible federal law claim. Plaintiff argues that the district court erred in failing to recognize that, even though defendant, as a federally chartered corporation, is not incorporated under the laws of any State, diversity jurisdiction was established under the principal-place-of-business provision of 28 U.S.C. § 1332(c)(1). That provision, however, is properly read to apply not independently, but only in conjunction with the statute's State-of-incorporation provision, such that a corporation is a citizen not only of the State of its incorporation but also of the State where it has its principal place of business. That reading comports with Congress's purpose to narrow diversity jurisdiction in cases involving State-chartered corporations. In sum, § 1332(c)(1) does not pertain to federally chartered corporations, such as defendant, that are not incorporated by any State. Thus, the district court correctly concluded that diversity jurisdiction was not established in this case and properly ordered dismissal. As for plaintiff's other challenges, the district court acted within its discretion in declining both to reconsider its prior rulings and to reopen the case.

AFFIRMED.

Judge Menashi dissents in a separate opinion.

JOSHUA FULD NESSEN, The Maddox Law Firm, LLC, Weston, CT, *for Plaintiff-Appellant*.

JOSEPH J. LYNETT (Sydney A. Mendelsohn, *on the brief*), Jackson Lewis P.C., New York, NY, *for Defendant-Appellee*.

———————————

REENA RAGGI, *Circuit Judge*:

Plaintiff Arnold Schneiderman, a citizen of New York, invoked diversity jurisdiction to sue defendant The American Chemical Society ("ACS"), a federally chartered corporation, in the United States District Court for the Eastern District of New York (Roslynn R. Mauskopf, *Judge*) for alleged disability discrimination in violation of New York State law. *See* Third Am. Compl. ¶¶ 4, 45 (citing 28 U.S.C. § 1332(a)(1)), *Rumain et al. v. Am. Chem. Soc'y* ("*Schneiderman*"), No. 17-CV-2530 (E.D.N.Y.), Dkt. No. 48.[1] Schneiderman now appeals from a judgment of that court entered on September 30, 2021, which dismissed his complaint for lack of subject matter jurisdiction based on a failure to demonstrate diversity of citizenship. *See Schneiderman v. Am. Chem. Soc'y*, No. 17-CV-2530, 2021 WL 5122078, at *5 (E.D.N.Y. Sept. 28, 2021) (ordering dismissal without prejudice to refiling in state court). Schneiderman also appeals from a post-judgment order entered on December 28, 2023, which denied the last in a series of *pro se* motions seeking reconsideration of

---

[1] While the docket was originally captioned "*Rumain et al. v. Am. Chem. Soc'y*," plaintiff Barbara Rumain has since been dropped from the action. Thus, for simplicity, we hereafter cite the district court docket as "*Schneiderman*."

3

dismissal and reopening of the case for further discovery as to a possible federal law claim.

In challenging dismissal, Schneiderman argues that the district court erred in failing to recognize that, even though ACS is a "federally chartered corporation" not incorporated under the laws of any State, 36 U.S.C. § 20501, it is a State citizen subject to diversity jurisdiction in this case because its "principal place of business" is Washington, D.C., 28 U.S.C. § 1332(c)(1).[2]  This effectively construes the conjunction "and," as used in § 1332(c)(1), to join independent clauses disjunctively, such that "a corporation shall be deemed to be a citizen of every State . . . by which it has been incorporated and [whether or not it has been incorporated by any State] of the State . . . where it has its principal place of business."  To the contrary, we conclude that Congress intended for the word "and" in § 1332(c)(1) to act effectively as a correlative conjunction, so that "a corporation shall be deemed to be a citizen [not only] of every State . . . by which it has been incorporated [but also] of the State . . . where it has its principal place of business."  Indeed, because the first provision's reference to "*every* State by which it *has been incorporated*" presupposes incorporation by some State, the principal-place-of-business provision can only be understood to identify a State of citizenship in addition to that already identified by the State-of-incorporation provision, not to identify a State of citizenship even in the absence of any State of incorporation.  Insofar as there is any textual ambiguity on that point, context and history, as discussed herein, support this correlative conjunctive construction.  Moreover, that conclusion comports with Congress's singular purpose in enacting these two § 1332(c)(1) provisions:  to narrow the availability of diversity jurisdiction in cases involving State-chartered corporations.  *See infra* at 38–46

---

[2] *See infra* at 11 (quoting statute).

(documenting history). Nowhere has Congress signaled any intent for § 1332(c)(1) to be construed to expand diversity jurisdiction to reach federally chartered corporations generally.

In sum, § 1332(c)(1) does not pertain to federally chartered corporations such as ACS, which are not incorporated by any State. Thus, the district court correctly ruled that ACS, as a federally chartered corporation, was not subject to diversity jurisdiction and that Schneiderman's case had to be dismissed for lack of subject matter jurisdiction. As for Schneiderman's other arguments, we identify no abuse of discretion in the district court's decision not to reconsider dismissal or to reopen the case. Accordingly, we affirm the challenged judgment and order.

## BACKGROUND

### I. Dismissal of Schneiderman's Third Amended Complaint

#### A. Underlying Allegations

In April 2017, plaintiffs Arnold Schneiderman and his mother Barbara Rumain, proceeding *pro se*, sued ACS for disability discrimination in violation of state and federal law. They alleged that ACS had failed to provide Schneiderman with certain reasonable accommodations necessary for him to participate in the New York-based section of the 2014 United States National Chemistry Olympiad, a high-school chemistry competition sponsored by ACS. Schneiderman alone subsequently amended the complaint and later, acting through counsel, amended it twice more. The Third Amended Complaint, at issue on this appeal, no longer alleged any violations of federal law. Its single allegation was a violation of the New York State Human Rights Law. *See* Third Am. Compl. ¶ 1, *Schneiderman*, Dkt. No. 48. Thus, federal jurisdiction was premised solely on the parties' purported diverse citizenship. *See* 28 U.S.C. § 1332.

5

### B. Diversity Jurisdiction

#### 1. Schneiderman's Argument for a Judge-Made Jurisdictional Rule

ACS moved to dismiss the Third Amended Complaint for lack of subject matter jurisdiction and failure to state a claim. As to jurisdiction, ACS argued that "[c]ourts have consistently held that absent unusual circumstances, federally chartered corporations, such as ACS, are not citizens of a single state for diversity purposes." Def. Br. Mot. Dismiss at 8, *Schneiderman*, Dkt. No. 62 (collecting cases).

In response, Schneiderman did not invoke § 1332(c)(1)—and certainly not its principal-place-of-business provision—to support diversity jurisdiction over ACS. To the contrary, he disavowed any *statutory* support for diversity jurisdiction in his case, conceding that Congress "has not directly enacted a statute recognizing that [ACS's] category of federally chartered corporations should be subject to diversity jurisdiction, for example, by pegging their citizenship to their 'principal place of business.'" Pl. Br. Opp. Mot. Dismiss at 19, *Schneiderman*, Dkt. No. 63.

Instead, Schneiderman urged the district court to extend diversity jurisdiction to reach ACS because "federal judges can properly take the initiative to broaden the basis for jurisdiction over federally chartered corporations in warranted situations *without* specific statutory authorization from Congress." *Id.* at 4 (emphasis in original); *see id.* at 20 (noting that "federal courts and not Congress" had "carved out a 'localization exception'" subjecting some federally

6

chartered corporations to diversity jurisdiction).[3]  He asked the district court to "make a potentially landmark decision barring ACS from deploying its [federal] charter to block his access to federal court."  *Id.* at 2, 15.  He cited five factors to support such a judge-made rule: (1) the policy implications of the "31-Year Congressional Moratorium on Issuance of New Federal Charters," (2) "[t]he Specific History of ACS and Its Worthless Federal Charter," (3) the existence of the judicially created "localization" exception for asserting jurisdiction over federally chartered corporations, (4) the lack of a policy rationale for exempting federally chartered corporations from diversity jurisdiction while asserting it over large State-chartered corporations, and (5) the fact that a judge-made jurisdictional expansion would serve the policy objectives of diversity jurisdiction.  *Id.* at 16–25.  None of these factors derives from § 1332(c)(1)'s text.

---

[3] *See, e.g., Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 428 (7th Cir. 2009) (discussing development of localization doctrine).  Schneiderman referenced "localization" in the district court *only* to argue that the judiciary was authorized to make still other rules extending federal jurisdiction.  Indeed, he emphatically disavowed "localization" as a basis for the exercise of diversity jurisdiction in this case.  *See* Pl. Br. Opp. Mot. Dismiss at 22, *Schneiderman*, Dkt. No. 63 (stating that Schneiderman was "*not* arguing that [ACS] falls within this exception" (emphasis in original)).  This waived the point for purposes of appellate review.  *See United States v. Mangano*, 128 F.4th 442, 466 (2d Cir. 2025) ("[W]hen a party concedes a point before a lower court, it generally 'waive[s] . . . the issue' and cannot thereafter raise an argument [on appeal] that is contrary to the concession." (second alteration in original) (quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72–73 (2013)).  Schneiderman does not contend otherwise in this court, thus abandoning any challenge to waiver on appeal.  *See generally Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 n.5 (2d Cir. 2010) ("It is well established that an argument not raised on appeal is deemed abandoned and lost." (internal quotation marks and citation omitted)).  Insofar as our dissenting colleague faults us for not excusing waiver and abandonment to identify diversity jurisdiction based on localization, we respond *infra* at 47–53.

## 2. The District Court's Decision

The district court granted ACS's motion to dismiss, finding that Schneiderman had failed to demonstrate the diversity of citizenship required for the exercise of federal jurisdiction. *See Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 443 (2d Cir. 2019) ("[T]he party asserting subject matter jurisdiction[] has the burden of proving that it exists."). The court explained that federally chartered ACS could not be considered a citizen of the District of Columbia, as Schneiderman urged, because the "Supreme Court has long held that an entity 'incorporated under acts of Congress, not state laws,' whose 'activities and operations [are] not to be confined to a single state, but to be carried on . . . in different states' is 'not a citizen of any state'" and thus, "a lawsuit between a citizen of one state and a federally chartered corporation 'is not one between citizens of different states'" giving rise to diversity jurisdiction. *Schneiderman v. Am. Chem. Soc'y*, 2021 WL 5122078, at \*4 (quoting *Bankers' Tr. Co. v. Texas & P. Ry. Co.* ("*Bankers' Trust*"), 241 U.S. 295, 309 (1916)) (alterations in original). Nor could the court itself create an exception to this rule for ACS because "the Constitution 'authorizes Congress . . . to determine the scope of the federal courts' jurisdiction within constitutional limits,'" and that authority is "'an essential ingredient'" of the separation of powers among the branches of the federal government. *Id.* at \*5 (ellipsis in original) (quoting first *Hertz Corp. v. Friend*, 559 U.S. 77, 84 (2010), and then *Patchak v. Zinke*, 583 U.S. 244, 253 (2018)).

Nevertheless, the district court *sua sponte* considered whether § 1332(c)(1)—added to § 1332 by amendment in 1958,[4] *i.e.*, well after *Bankers' Trust*—supports an exercise of diversity jurisdiction in this case. The court concluded that it did not

---

[4] *See* Act of July 25, 1958, Pub. L. 85-554, 72 Stat. 415 (1958).

because "no evidence" indicated that Congress intended for § 1332(c)(1)'s principal-place-of-business criterion to apply "'to federally chartered corporations as well as to corporations organized under state law.' To the contrary, the 'overriding purpose of [§ 1332(c)(1)] was to restrict the diversity jurisdiction of the federal courts by making it more difficult for corporations to attain complete diversity.'" *Id.* at *4 (quoting *Burton v. U.S. Olympic Comm.*, 574 F. Supp. 517, 519 (C.D. Cal. 1983)) (citing James W. Moore & Donald T. Weckstein, *Corporations and Diversity of Citizenship Jurisdiction: A Supreme Court Fiction Revisited* ("Moore & Weckstein, *Corporations and Diversity*"), 77 Harv. L. Rev. 1426, 1431 (1964); *Crum v. Veterans of Foreign Wars*, 502 F. Supp. 1377, 1380 n.6 (D. Del. 1980)). In that regard, the district court also quoted a leading commentator's observation that § 1332(c)(1) "affect[s] the jurisdictional status of state-incorporated companies only, leaving the status of federal corporations to future judicial elaboration." *Id.* (quoting 15 *Moore's Federal Practice* § 102.56[4] (3d ed. 2006)). In a parenthetical, it also quoted another commentator's observation that § 1332(c)(1) "applies only to state-chartered corporations, not to federal corporations." *Id.* (quoting Paul E. Lund, *Federally Chartered Corporations and Federal Jurisdiction* ("Lund, *Federally Chartered Corporations*"), 36 Fla. St. U. L. Rev. 317, 337 (2009)).

Accordingly, it entered the appealed judgment dismissing Schneiderman's case.

## II.    Post-Judgment Motions

Proceeding *pro se*, Schneiderman continued to litigate this case. He filed a notice of appeal from the judgment of dismissal and then successive motions seeking to reopen the case and to continue discovery as to a possible federal claim under the Rehabilitation Act, 29 U.S.C. § 701 *et seq.* The district court denied these motions, the last by order entered on December 28, 2023, from which

9

Schneiderman filed a timely notice of appeal. This court consolidated that appeal with his earlier appeal from the judgment of dismissal, and, thus, we address both in this opinion.

## DISCUSSION

### I. Subject Matter Jurisdiction

In appealing the dismissal of his case for lack of subject matter jurisdiction, Schneiderman, again represented by counsel, abandons his argument for a new judicial rule extending diversity jurisdiction to ACS in this case.[5] Instead, he argues that the text of § 1332(c)(1)—specifically, that statute's principal-place-of-business provision as construed by the Fourth Circuit in *Navy Federal Credit Union v. LTD Financial Services, LP* ("*Navy Federal*"), 972 F.3d 344, 356–64 (4th Cir. 2020)—compels the conclusion that he and ACS are citizens of different States, supporting federal jurisdiction.[6]

---

[5] As Schneiderman explicitly states that his current argument addresses the jurisdictional issue "in a different manner on appeal than he did in the District Court," Appellant's Reply Br. at 6, we deem this new-judicial-rule point abandoned on appeal and do not discuss it further. *See Drabinsky v. Actors' Equity Association*, 106 F.4th 206, 217 n.5 (2d Cir. 2024) ("[An appellant] abandon[s] []his argument by not raising it in his opening brief." (citations omitted)).

[6] Although Schneiderman disavowed any statutory basis for diversity jurisdiction over ACS in the district court, *see supra* at 6–7 & n.3, because that court *sua sponte* considered and rejected the possibility of § 1332(c)(1) subjecting ACS to such jurisdiction, *see supra* at 8–9, this court can entertain Schneiderman's belated statutory argument even if waived below. *See Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 378–79 (1995) (holding it appropriate to review "expressly disavowed" point reached by lower courts); *United States v. Harrell*, 268 F.3d 141, 146 (2d Cir. 2001) (stating that issue is reviewable on appeal

10

Title 28 U.S.C. § 1332(c) states in relevant part:

For the purposes of this section . . .

(1) a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business . . . .

In *Navy Federal*, a federally chartered credit union operating nationwide but headquartered in Virginia relied on § 1332(c)(1)'s principal-place-of-business

---

if "pressed or *passed upon* below" (emphasis added) (citation omitted)); *Torcivia v. Suffolk Cnty.*, 17 F.4th 342, 356 n.24 (2d Cir. 2021) (reviewing district court decision rendered on basis not advanced by party below). The district court's decision to rule on the question of whether § 1332(c)(1) supports diversity jurisdiction is what distinguishes this waiver from that pertaining to localization, which the district court relied on in *not* addressing that point. *See supra* at 7 n.3.

Thus, the dissent is mistaken in suggesting that we misapply waiver to selective effect, *see* Dissenting Op., *post*, at 23–24, when we afford Schneiderman the benefit of the court's *sua sponte* ruling on a statutory point he did not make, while holding him to his waiver of a localization point that (1) was *not* ruled on below, and (2) he does not raise even on appeal. It is also mistaken in charging the district court with abuse of discretion for conducting this statutory review *sua sponte. See id.* at 31. Waiver and forfeiture principles generally pertain to appellate review of matters raised after judgment, not to district courts' review before judgment. In urging otherwise, the dissent quotes from *Wood v. Milyard*, 566 U.S. 463 (2012), but the text derives not from that opinion but from *Day v. McDonough*, 547 U.S. 198 (2006). There, in the context of a state prisoner's petition for habeas corpus relief, the Supreme Court stated that it would be "an abuse of discretion" for a district court "to override a State's deliberate waiver of the limitations *defense*" statutorily applicable to the petition, *id.* at 202 (emphasis added). This case involves neither a habeas petition nor a defense subject to pleading requirements established by law or rule. In any event, Schneiderman was hardly prejudiced by the district court's consideration of a waived statutory basis for diversity jurisdiction that might have been resolved in his favor, even without need for the new judicial exception urged by him.

provision to assert that it was a citizen of Virginia for purposes of maintaining a federal diversity action against defendants, all citizens of other States. In dismissing the suit for lack of jurisdiction, the district court there construed the word "and" in the relevant statutory text—"[A] corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated *and* of the State or foreign state where it has its principal place of business," 28 U.S.C. § 1332(c)(1) (emphasis added)—to operate conjunctively, such that the principal-place-of-business provision applied only to corporations referenced in the State-of-incorporation provision, *i.e.*, to corporations "chartered by a 'State or foreign state,' not by the federal government." *Navy Federal*, 972 F.3d at 350 (summarizing district court's conclusion and quoting § 1332(c)(1)). The Fourth Circuit agreed that "[t]he plain meaning of *and* in context here is 'in addition to.'" *Id.* (emphasis in original). Nevertheless, it concluded that the statute's principal-place-of-business provision could confer State citizenship even without State incorporation, reasoning that "when we add something [*i.e.*, the State of a federally chartered corporation's principal place of business] to nothing [*i.e.*, the absence of any State of incorporation for such an entity], something remains." *Id.*

In reaching that conclusion, the Fourth Circuit acknowledged that a certain ambiguity inheres in the word "and." Indeed, it characterized the word as a linguistic "chameleon[]," "used to 'combine items,'" without necessarily telling "*how*" the items are to be combined. *Id.* at 356–57 (emphasis in original) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*

12

("Scalia & Garner, *Reading Law*") (2012)).[7] Nevertheless, the court construed "and" as used in § 1332(c)(1) to join independent grounds for identifying a corporation's citizenship, referencing (1) the "structural independence" of the principal-place-of-business and State-of-incorporation provisions, *id.* at 357 (noting that "[e]ach provides a different basis" for identifying corporate citizenship, and "parallel use of the preposition 'of' confirms that both clauses . . . are directed toward the word 'citizen,' not one another"); (2) the provisions' "logical independence," *id.* at 357–58 (noting that State of incorporation does not depend on corporation's headquarters and *vice versa*, and observing that when connected objects are "independent, they are generally taken in addition;" but when "dependent, they must be taken jointly" (internal quotation marks omitted)); and (3) the more obvious disjunctive use of "and" throughout § 1332(c)(1), *id.* at 358–59.

We have carefully considered the Fourth Circuit's reasoning in *Navy Federal* but, in the end, we cannot adopt it as our own. In construing any statute, a court's "first job is to try to determine congressional intent." *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 35 (1990). That inquiry "begins with the statutory text, and ends there as well if the text is unambiguous." *BedRoc Ltd., LLC v. United States*, 541 U.S.

---

[7] While our dissenting colleague disparages our reference to "and" as a "chameleon" in identifying textual ambiguity, *see* Dissenting Op., *post*, at 3, the characterization is hardly original to us. Rather, as text indicates, it derives from *Navy Federal*—on which our colleague otherwise relies—which borrowed the term from the Supreme Court. *See Navy Federal*, 972 F.3d at 357 (citing *Kucana v. Holder*, 558 U.S. 233, 245 (2010)). Moreover, the Supreme Court and leading commentators have recognized that construing "and" in statutory text can "get . . . complicated," *Pulsifer v. United States*, 601 U.S. 124, 133 (2024) (discussed *infra* at 15–20 & n.11), particularly when deciding, as here, how items are to be combined, *see* Scalia & Garner, *Reading Law*, at 116. Thus, as we explain herein, there is a need to employ various tools of statutory construction to discern—as we ultimately do discern—Congress's intent in using "and" to join § 1332(c)(1)'s principal-place-of-business provision to its State-of-incorporation provision.

176, 183 (2004); *see United States ex rel. Weiner v. Siemens AG*, 87 F.4th 157, 161 (2d Cir. 2023).  That, however, is not this case.

Here, there is textual ambiguity as to how the word "and" combines § 1332(c)(1)'s principal-place-of-business provision with its State-of-incorporation provision.  This textual ambiguity precludes us from concluding, as the Fourth Circuit did, that our inquiry can "pretty much end[]" with text.  *Navy Federal*, 972 F.3d at 364 (internal quotation marks omitted).  To resolve this ambiguity, we must consider the text in light of statutory context, various rules of construction, and legislative history.  Doing so reveals Congress's intent for "and" to join § 1332(c)(1)'s principal-place-of-business provision with its State-of-incorporation provision in much the manner of a correlative conjunction, such that a corporation is deemed a citizen *not only* of every State by which it has been incorporated, which presupposes some State of incorporation, *but also* of the State where that corporation has its principal place of business.  This construction comports, moreover, with Congress's undoubted purpose, which was to *limit* State-chartered corporations' ability to sue or to be sued in diversity.  *See also Hertz Corp. v. Friend*, 559 U.S. at 86 (explaining that § 1332(c)(1) was prompted by judicial concern that federal "dockets contained too many diversity cases").  Nothing in the statutory text, context, or history indicates that Congress combined the two provisions intending for them to operate independently and, thus, *sub silentio*, to *expand* diversity jurisdiction to reach federally chartered corporations generally.  A court proceeds cautiously in assuming such intent, mindful that "the Constitution specifically vests" the power "to expand [federal] jurisdiction . . . in the Congress, not in the courts."  *Snyder v. Harris*, 394 U.S. 332, 341–42 (1969); *accord Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 696 (2006).

14

Accordingly, for reasons explained more fully herein, we conclude that § 1332(c)(1)'s principal-place-of-business clause cannot confer State citizenship on a federally chartered corporation such as ACS.

## A.   Textual Ambiguity

When, as here, we construe an undefined word in statutory text—such as the word "and" as used in § 1332(c)(1)—we assume that Congress intended for the word to have its "ordinary meaning," particularly where the word is a "term[] of everyday usage."  *EPA v. Calumet Shreveport Ref. LLC*, 605 U.S. 627, 643 (2025); *see Gibbons v. Ogden*, 22 U.S. 1, 188 (1824) (Marshall, *C.J.*) (holding that courts presume that Congress "employed words in their natural sense, and . . . intended what [it] said").  As the Supreme Court recently observed, "'[a]nd' in grammatical terms, is of course a conjunction—a word whose function is to connect specified items." *Pulsifer v. United States* ("*Pulsifer*"), 601 U.S. 124, 133 (2024) (noting parties' agreement on dictionary definition for "and," meaning "along with or together with" (quoting *Webster's Third New Int'l Dictionary* 80 (1993))).  This distinguishes "and" from "or," a word that operates disjunctively to create alternatives.  *See* Scalia & Garner, *Reading Law*, at 116 ("Under the conjunctive/disjunctive canon, *and* combines items while *or* creates alternatives." (emphases in original)).

*Navy Federal* recognized the word "and" to signal Congress's intent to combine what it joined in § 1332(c)(1).  It further recognized the word to be ambiguous in revealing how this combination was to be effected.  *See supra* at 11–13.  In the end, however, it construed "and," as used in § 1332(c)(1), to permit something (*i.e.*, the State of a federally chartered corporation's principal place of business) to be combined with nothing (*i.e.*, the absence of any State of incorporation for such an entity).  That allowed the court to conclude that § 1332(c)(1)'s combined State-of-incorporation and principal-place-of-business

15

provisions operate independently of one another, such that a federally chartered corporation can be identified as a citizen of the State where it has its principal place of business even though it has no State of incorporation. As *Navy Federal* explained, "there is no problem with adding to a null set: zero plus one is one." 972 F.3d at 356.

However sound that reasoning may be as a matter of basic arithmetic, we are not convinced that it is linguistically ineluctable. As the Supreme Court observed in *Pulsifer*, the dictionary defines "and" to mean "'along with or together with,'" but "things get more complicated . . . in figuring out what goes along or together with what" in statutory text. 601 U.S. at 133 (quoting *Webster's Third New Int'l Dictionary* at 80).[8]

In § 1332(c)(1), the two "whats" being combined by the word "and" are "every State by which [a corporation] has been incorporated" and "the State where it has its principal place of business." *Supra* at 11 (quoting statute). Congress's reference to "*every* State" in the text's incorporation provision is noteworthy. "Every" is commonly defined as "being each individual or part of a class or group whether definite or indefinite in number without exception." *Webster's Third New Int'l Dictionary* at 788. Thus, the word presupposes that the corporation in question is one that has been incorporated by *some* State. It does not contemplate a null set,

---

[8] By acknowledging this caution from the Supreme Court, we do not conclude that the word "and" is "too complicated" to understand. Dissenting Op., *post*, at 24. Indeed, by reference to text, context and history, we explain herein how "and" is properly understood to join § 1332(c)(1)'s principal-place-of-business provision to its State-of-incorporation provision conjunctively rather than disjunctively.

16

as hypothesized by *Navy Federal*.[9]  In urging otherwise, our dissenting colleague submits that "the word 'every' ensures that a corporation will be deemed to be a citizen of *all* American states and foreign states by which it has been incorporated." Dissenting Op., *post*, at 5 (emphasis in original). True enough.  But the dissent then asserts that such "usage is consistent with the possibility that the total number of such states will be a null set."  *Id.* (internal quotation marks omitted).  That conclusion, however, ignores the verb that Congress used in § 1332(c)(1)'s State-of-incorporation provision: "every State by which [a corporation] *has been incorporated*."  Such use of the present-perfect tense indicates that the presupposed State incorporation has, in fact, occurred.  It does not admit the possibility of no such incorporation. *See* Bryan A. Garner, *The Chicago Guide to Grammar, Usage, and Punctuation* ("Garner, *The Chicago Guide to Grammar*") 97, 113 (2016) (explaining that "present-perfect tense," which uses a form of "have" plus a past participle, "denotes an act, state, or condition that is now completed or continues up to the present").  Thus, Congress's use of "and" to join a corporation's principal place of business with its State of incorporation cannot be understood to have admitted the possibility of something being added to nothing.  Rather, it is more sensibly understood to have added something (State citizenship based on a corporation's principal place of business) to something else that already exists (State citizenship based on incorporation).  It is thus that "and" effectively functions as a correlative conjunction, deeming a corporation a citizen not only of every State by which it

---

[9] The dictionary illustrates "every" with the example of one said to have "listened carefully to his [every] word." *Webster's Third New Int'l Dictionary* at 788.   This presupposes that there were, in fact, some words to which to listen.

has been incorporated (which must be at least one) but also of the State where it has its principal place of business (which may be different).[10]

In construing these provisions of § 1332(c)(1) to admit the possibility of State citizenship based on a corporation's principal place of business even in the absence of incorporation by any State, *Navy Federal* effectively transforms the conjunctive "and" into the disjunctive "or," such that the statutory provisions operate as independent alternatives. Schneiderman (and presumably our dissenting colleague) would have us do the same. A court, however, does not readily assume that Congress used one word when it meant another. Thus, we might conclude simply from Congress's use of the word "and" rather than "or" that § 1332(c)(1)'s principal-place-of-business provision does not operate independently of, or disjunctively from, the statute's State-of-incorporation provision but, rather,

---

[10] Nor are we persuaded otherwise by the dissent's hypothetical positing a competition with rules providing that "every competitor who achieves a perfect score will receive a prize." Dissenting Op., *post*, at 5. The dissent submits that "no one would say that a perfect score must be awarded at each competition," maintaining therefrom that "the state-of-incorporation clause does not suggest that a corporation *must* be incorporated by an American state or a foreign state for § 1332(c)(1) to apply." *Id.*

We respectfully submit that to be helpful to our task here, the hypothetical's language would have to better track that of § 1332(c)(1), which uses "and" to link a two-part definition. For example, "a competitor shall be deemed to be a prizewinner of every competition in which he has received a perfect score and in which he competed while under the age of 18." In this circumstance, is "prizewinner" defined by independent alternatives such that a competitor would receive a prize if he competed while under 18 even without achieving a perfect score? Or, would the competitor be a prizewinner only if he received a perfect score when competing under age 18? While the dissent attempts a second hypothetical, we do not pursue the point further because, in any event, that hypothetical also fails to show clearly that "and" means "or," much less that it does so in § 1332(c)(1). Thus, we focus only on § 1332(c)(1)'s text and not on hypotheticals, particularly those with distinguishable language and structures.

18

operates in conjunction with it.  We hesitate in that conclusion only because we cannot dismiss outright the possibility of Congress having used "and" when it meant "or" in § 1332(c)(1).

To illustrate, when Article III of the Constitution states that federal "judicial power shall extend to all cases . . . arising under this Constitution, the laws of the United States, *and* treaties," U.S. Const., art. III, § 2 (emphasis added), it does not mean that such power extends only to cases arising under all three.  Rather, "and" is there used to extend federal judicial power to all cases arising under the Constitution, the laws of the United States, *or* treaties.  *See Pulsifer*, 601 U.S. at 134–35 (using example in concluding that "and" in sentencing statute also operates disjunctively).[11]  Not so, however, with the Sixth Amendment guarantee of "the right to a speedy and public trial."  U.S. Const., amend. VI.  That clause does not operate in the alternative to guarantee an accused a trial that is speedy *or* public.  Rather, it is properly construed in the conjunctive to require that a defendant be given a trial that is not only speedy but also public.  *See Pulsifer*, 601 U.S. at 172

---

[11] In *Pulsifer,* the Supreme Court observed that the constitutional provision could be recast to read that federal "judicial power extends to cases arising under the Constitution; extends to cases arising under federal law; *and* extends to cases arising under treaties." 601 U.S. at 134–35 (emphasis added).  It similarly recast the sentencing statute there at issue, which affords relief from otherwise applicable mandatory minimums to a "defendant [who] does not have—(A) more than 4 criminal history points . . .; (B) a prior 3-point offense. . .; *and* (C) a prior 2-point violent offense," 18 U.S.C. § 3553(f) (emphasis added), as if it read that "defendant can get safety-valve relief only if he does not have A, does not have B, and does not have C," *Pulsifer*, 601 U.S. at 153.  The Court did not take exception to Pulsifer's argument that the word "or" more clearly supported such a construction.  *See id.* at 137.  Rather, it noted that "we do not demand (or in truth expect) that Congress draft in the most translucent way possible."  *Id.* at 137–39 (proceeding to explain why, in particular statutory context at issue, Congress might have preferred "and" to "or").

(Gorsuch, *J.*, dissenting) (citing example and cautioning that "difference between words like 'and' and 'or' often cannot be easily dismissed as meaningless").[12]

We do not cite these examples of how the word "and" can operate as a sort of linguistic chameleon—sometimes linking words conjunctively and sometimes allowing them to operate independently in the disjunctive—to indicate that we find the word so "befuddling" as to "throw[] up [our] hands at an apparently irresolvable textual ambiguity." Dissenting Op., *post*, at 3, 5.[13] We cite these examples only to illustrate why we inquire further into whether, in § 1332(c)(1), Congress used "and" intending for a corporation to be deemed a citizen of the State of its principal place of business *regardless* of whether it is also a citizen of a State of incorporation, or whether Congress used "and" to signal that a corporation is a citizen not only of every State by which it has been incorporated but also of the State where it has its principal place of business.

We begin that inquiry by considering the text in light of statutory context.

### B. Statutory Context

#### 1. Textual Context

As the Supreme Court has observed, when construing the word "and" in statutory text, "it all depends"—*e.g.*, depends on factors such as the "substance"

---

[12] *See infra* at 23 n.16 (discussing how punctuation differences between two discussed constitutional provisions can inform their construction).

[13] Rather than detail every mischaracterization of the majority opinion by the dissent, we simply state the obvious: this opinion speaks for itself, without regard to any gloss the dissent applies.

of the words joined by "and," as well as "the way they interact, as against relevant background understandings." *Pulsifer*, 601 U.S. at 140–41.

As recognized *supra* at 15–18, the substance of § 1332(c)(1)'s State-of-incorporation provision—particularly its use of the word "every" together with the present-perfect verb "has been incorporated"—presupposes that the corporation under consideration has been incorporated by at least one State. Thus, when Congress combined that provision with a principal-place-of-business provision, it can reasonably be understood to have intended for the latter to apply conjunctively to identify an additional State of citizenship where different from the already identified State of incorporation.[14] In concluding otherwise, *Navy Federal* characterized § 1332(c)(1)'s State-of-incorporation and principal-place-of-business provisions as structurally and logically independent. *See* 972 F.3d at 357–59. We respectfully disagree.

As to structural independence, *Navy Federal* observed that the two provisions are each introduced by the preposition "of," "confirm[ing] that both clauses . . . are directed toward the word 'citizen,' not one another," which "suggests that these clauses operate independently to deem a corporation a citizen of a particular jurisdiction." *Id.* at 357. The two provisions may each be directed at the word "citizen," but that does not mean that they operate independently. When the conjunction "and" is used to join two elements, there is an "implied *both* before the first element." Scalia & Garner, *Reading Law*, at 117 (emphasis in original). *Navy Federal*'s conclusion, however, entails an implied *either*, more

---

[14] Far from concluding that the statutory text "lacks a discernable meaning," Dissenting Op., *post*, at 3, we understand it to have this meaning.

21

properly associated with the conjunction "or."  *See id.* at 116.  Further, other structural features can support a different conclusion.

For example, no punctuation separates the State-of-incorporation and principal-place-of-business provisions, as one might expect if Congress's intent had been for them to operate independently in identifying States of corporate citizenship.  *See*, *e.g.*, *The Chicago Manual of Style* § 6.60 (18th ed. 2024) ("[A] semicolon is most commonly used between two independent clauses."); William Strunk, Jr. & E.B. White, *The Elements of Style* 5 (4th ed. 2000) ("Place a comma before a conjunction introducing an independent clause.");  *see also* Scalia & Garner, *Reading Law*, at 161 ("Punctuation in a legal text will rarely change the meaning of a word, but it will often determine whether a modifying phrase or clause applies to all that preceded it or only to a part.").  By contrast, the three § 1332(c)(1) provisions according State citizenship to insurers are stated in distinct lettered parts, separated by semicolons.[15]  Thus, even assuming that Congress used

---

[15] The referenced provisions state an *exception* to the text here at issue in identifying corporate citizenship:

> [A] corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business *except* that in any direct action against the insurer of a policy or contract of liability insurance, whether incorporated or unincorporated, to which action the insured is not joined as a party-defendant, such insurer shall be deemed a citizen of—
>
> > (A) every State and foreign state of which the insured is a citizen;
> >
> > (B) every State and foreign state by which the insurer has been incorporated; and

"and" intending for those three provisions to operate independently, *but see* Scalia & Garner, *Reading Law*, at 118 (observing that even such punctuation and structure can indicate conjunctive elements when joined by "and"), the absence of similar structure or punctuation for the State-of-incorporation and principal-place-of-business provisions here at issue requires us to consider whether Congress there intended for "and" to operate differently.[16]

We do not suggest that this punctuation point is determinative. We note it simply to explain why, unlike the Fourth Circuit, we cannot conclude that the structure of § 1332(c)(1) eliminates ambiguity as to how Congress intended the

---

> (C) every State or foreign state where the insurer has its principal place of business . . . .

28 U.S.C. § 1332(c)(1) (emphasis added). The dissent submits that it would have been "ungrammatical" for Congress to have used a semicolon between § 1332(c)(1)'s State-of-incorporation and principal-place-of-business provisions because they are joined by a conjunction. Dissenting Op., *post*, at 6. But, as the quoted text shows, Congress *did* use semicolons (together with lettered subparts) to distinguish the insurer-citizenship provisions even though they were joined by a conjunction. Insofar as the dissent also submits that it would have been improper to use a comma between the State-of-incorporation and principal-place-of-business provisions because they are not true independent clauses, *see id.* at 6, it is the Fourth Circuit (and the dissent) that insist that the clauses "operate independently," *Navy Federal*, 972 F.3d at 357; *see also* Dissenting Op., *post*, at 2, 4, 6 (insisting that clauses are independent). We here note only that Congress did *not* signal as much by using the obviously disjunctive word "or;" nor did it do so by "structural" means such as punctuation or subsections, as it did with the insurance provisions.

[16] We note that in the two constitutional provisions referenced *supra* at 19–20, commas are used to separate the three areas of federal judicial power that operate disjunctively, U.S. Const., art. III, § 2 (referencing "this Constitution, the laws of the United States, and treaties"), but no punctuation suggests that the "right to a speedy and public trial" is anything other than conjunctive, *id.* amend. VI.

23

word "and" to join the State-of-incorporation and principal-place-of-business provisions at issue.

As to logical independence, *Navy Federal* reached that conclusion by reasoning that "a corporation's place of incorporation does not depend on the location of its headquarters—nor does the place of its headquarters turn on the location of its incorporation." 972 F.3d at 358. True enough. But that tells us nothing about whether Congress used the word "and" in § 1332(c)(1) intending for these locations to be considered in conjunction with one another or independently in identifying States of corporate citizenship. "Of course it does," asserts the dissent, reasoning that the "independence of the clauses means that there is no reason to read into the statute an intention . . . to operate conjunctively." Dissenting Op., *post*, at 9. But that conclusion fails to persuade because the fact that the clauses operate independently in certain respects—one in identifying an entity's place of incorporation and the other in identifying its principal place of business—does not tell us that Congress intended for the latter clause to operate independently of the former clause in a different respect, *i.e.*, identifying State citizenship. This does not mean that we ourselves "read into the statute an intention for the clauses to operate conjunctively" as the dissent charges. *Id.* But it does signal caution in construing Congress's use of the conjunctive "and" to function as the disjunctive "or."

In *Pulsifer*, the Supreme Court concluded that any textual ambiguity as to whether the word "and" in the statute there at issue operated conjunctively or disjunctively was effectively eliminated by recognizing the "glaring superfluity" in a conjunctive construction of the listed requirements for avoiding mandatory minimum prison sentences. 601 U.S. at 152–53. That, however, is not this case. Nothing in the federal diversity statute, 28 U.S.C. § 1332, is rendered superfluous

24

by construing § 1332(c)(1)'s principal-place-of-business provision to operate in conjunction with its State-of-incorporation provision to identify a possible *additional* State of citizenship for corporations already deemed citizens of their States of incorporation.

Indeed, such a conjunctive construction logically comports with precedent recognizing that § 1332(c)(1)'s two provisions work in tandem to confer "dual citizenship" on State-incorporated corporations—thereby limiting their ability to sue and to be sued in diversity jurisdiction. As this court has observed, "[b]efore Congress enacted the 'dual citizenship' provision of section 1332 in 1958, corporations were treated as citizens only of the State or foreign state in which they were incorporated." *Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 50 (2d Cir. 2012). As a result of that amendment, "[e]very corporation is now treated for diversity purposes as a citizen of *both* its state of incorporation *and* its principal place of business." *Id.* at 51 (emphases added).

We are not alone in construing § 1332(c)(1) to confer dual citizenship. *See, e.g.*, *Karazanos v. Madison Two Assocs.*, 147 F.3d 624, 628 (7th Cir. 1998) (referencing "[d]ual citizenship" afforded by § 1332(c)(1) in holding that for purposes of diversity jurisdiction "in cases with corporate parties, it is necessary to allege both the state of incorporation and the state of the principal place of business, even if they are one and the same"); *Rodriguez v. SK & F Co.*, 833 F.2d 8, 9 (1st Cir. 1987) (stating that "for purposes of diversity jurisdiction a corporation has dual citizenship, that of the state of its incorporation and that of the state where it has its principal place of business"); *Nike, Inc. v. Comercial Iberica de Exclusivas Deportivas, S.A.*, 20 F.3d 987, 990 (9th Cir. 1994) (stating that § 1332(c)(1) "creates a system of dual citizenship for corporations"); *Matter of Commonwealth Oil Ref. Co., Inc.*, 596 F.2d 1239, 1247 n.17 (5th Cir. 1979) ("The diversity statute was amended

in 1958 to give corporations dual citizenship; in addition to the traditional citizenship in the state of incorporation, a corporation would also be considered a citizen of the state where it has its principal place of business. The purpose of the amendment was to reduce the availability of diversity jurisdiction."); *see also* 13F *Wright & Miller's Federal Practice and Procedure* § 3624 (3d ed. 2025) ("The principal effect of Section 1332(c) is obviously to establish dual citizenship for most corporations—in the state of a company's incorporation and in the state in which the organization's principal place of business is located—thereby reducing the options for establishing corporate diversity jurisdiction."); 15A *Moore's Federal Practice* § 102App.04[5] (3d ed. 2025) (discussing how 1958 amendment "gave a dual citizenship to those corporations that have their principal place of business in a state different from that (or those) in which they are incorporated").[17]

---

[17] Our cases recognizing defunct or inactive corporations to be subject to diversity jurisdiction based on the State where they "last transacted business" are not to the contrary because there was no question that the corporations there at issue were also citizens of their States of incorporation; the only question was whether they could still also be deemed citizens of their States of (former) principal place of business. *Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*, 933 F.2d 131, 141 (2d Cir. 1991); *accord Pinnacle Consultants, Ltd. v. Leucasia Nat'l Corp.*, 101 F.3d 900, 907 (2d Cir. 1996). While the Third Circuit has held that a defunct corporation is a citizen only of its State of incorporation, it acknowledges that its ruling conflicts with that of this court. *See Midlantic Nat'l Bank v. Hansen*, 48 F.3d 693, 696–97 (3d Cir. 1995). Moreover, insofar as the Third Circuit appears to have applied § 1332(c)(1)'s State-of-incorporation provision independently of its principal-place-of-business provision, we do not understand it to have endorsed the reverse, *i.e.*, application of the principal-place-of-business provision to confer State citizenship on corporations not incorporated by any State. As discussed *supra* at 15–18, the text's reference to "*every* State" where a corporation "*has been incorporated*" presupposes that the corporation has been incorporated by at least one State. Thus, it is a citizen of that State and, then, also of the State where it has (or last had) its principal place of business.

To be sure, none of these cases or commentaries specifically consider the question of whether, or how, § 1332(c)(1) can apply to a federally chartered corporation. But they usefully provide some "background understanding" of § 1332(c)(1)'s State-of-incorporation and principal-place-of-business provisions as combining to afford a corporation dual State citizenship for purposes of narrowing diversity jurisdiction. *Pulsifer*, 601 U.S. at 141. The provisions can never work in conjunction to effect dual citizenship for federally chartered corporations because they are not incorporated by any State. With this background understanding of the statute, we are not convinced that § 1332(c)(1)'s State-of-incorporation and principal-place-of-business provisions are so logically independent as to resolve textual ambiguity in favor of the statute's application to federally chartered corporations, an application that would expand rather than narrow diversity jurisdiction.

Nor can that ambiguity be resolved by the "consistent usage" canon, which instructs that "[i]n a given statute, the same term usually has the same meaning." *Id.* at 149. Invoking this canon, *Navy Federal* concluded that, insofar as "and" is used to link the State-of-incorporation and principal-place-of-business provisions of § 1332(c)(1), the word is appropriately construed in the disjunctive because it so operates in other parts of the statute, notably, in extending citizenship based on "every State *and* foreign state" of incorporation. 972 F.3d at 358 (quoting 28 U.S.C. § 1332(c)(1)) (emphasis added). We are not persuaded.

First, as the Supreme Court recognized in *Pulsifer*, the consistent-usage canon is "mostly applied to terms with some heft and distinctiveness, whose use drafters are likely to keep track of and standardize." 601 U.S. at 149. That principle recognizes that "more than other canons, [the consistent usage canon] assumes a perfection of drafting that is not often achieved" because "drafters more than

27

rarely use the same word to denote different concepts." Scalia & Garner, *Reading Law*, at 170. Plainly, "and" is not a word of heft and distinctiveness. *See Pulsifer*, 601 U.S. at 149 (observing that it would "break[] new ground" to apply the consistent usage canon "to words as ubiquitous and . . . sometimes context-dependent as 'and' and 'or'").[18]

Second, and in any event, *Navy Federal* construed the word "and" disjunctively in that part of § 1332(c)(1)'s State-of-incorporation provision referencing "every State and foreign state" because it thought that a conjunctive construction there "would destroy diversity jurisdiction as we know it" given that most corporations are not "incorporated both domestically and overseas." 972 F.3d at 358.[19] We are not persuaded that this compels a disjunctive reading of "and" insofar as it joins § 1332(c)(1)'s principal-place-of-business provision to its State-of-incorporation provision.

In the latter provision, text itself supports the conclusion that the Fourth Circuit derived from common sense. The word "every" in the phrase "every State

---

[18] The dissent professes surprise at our failure to accord "a significant amount of heft" to the word "and," as used in § 1332(c)(1), given "all the effort" expended "to expound[] the meaning" of that word. Dissenting Op., *post*, at 12. But as text indicates, our reluctance to assume consistent usage of the word throughout § 1332(c)(1) simply heeds the cautionary note sounded by the Supreme Court in *Pulsifer*.

[19] A similar concern informed its disjunctive reading of the word "and" in that part of § 1332(c)(1)'s earlier referenced insurance provision deeming an insurer a citizen of "every State and foreign state" by which it has been incorporated. 28 U.S.C. § 1332(c)(1)(B); *see Navy Federal*, 972 F.3d at 359 (concluding that conjunctive construction of "and" in that phrase "would be self-defeating . . . yield[ing] only a null set of unincorporated associations"). As noted *supra* at 22–23 & n.15, differences in the structure and punctuation of the insurance provision might provide some support for that disjunctive reading.

and foreign state" is properly applied both to "State" and "foreign state," signaling Congress's intent to reach comprehensively in § 1332(c)(1) so as to confer citizenship—independently—on every corporation chartered by a State and on every corporation chartered by foreign states, not only on a State-and-foreign-state-chartered corporation. *See* Scalia & Garner, *Reading Law*, at 121 (discussing use of "every" to introduce words joined by conjunction "and"). But no comparable text pertains to the use of "and" to join § 1332(c)(1)'s principal-place-of-business provision to this State-of-incorporation provision. Thus, whatever force *Navy Federal*'s argument might claim with respect to the use of "and" in the State-of-incorporation provision, we hesitate to give it determinative weight under the consistent-usage canon in construing such a "context-dependent" word as "and" when used to join other statutory provisions. *Pulsifer*, 601 U.S. at 149.

Further, even assuming that reading "and" conjunctively in the phrase "every State and foreign state" would yield so small a set as to "destroy diversity jurisdiction as we know it," *Navy Federal*, 972 F.3d at 358, no such concern arises in construing "and" to join the statute's State-of-incorporation and principal-place-of-business provisions conjunctively rather than independently. Such a construction simply narrows the availability of federal diversity jurisdiction with respect to a corporation that has been incorporated in one or more States, but that has its principal place of business in another. It is the disjunctive construction now urged by Schneiderman that would significantly alter the general understanding of federal diversity jurisdiction. Whereas such jurisdiction has long been understood not to apply to federally chartered corporations generally, *see infra* at 31–34, construing § 1332(c)(1)'s principal-place-of-business provision to operate independently from its State-of-incorporation provision would so expand diversity jurisdiction as to reach every case involving a federally chartered

29

corporation except for those where the State of the corporation's principal place of business and its adversary's citizenship are the same.

In sum, with due respect to the views expressed by the Fourth Circuit in *Navy Federal*, when we consider the word "and" in the statutory context of § 1332(c)(1), we cannot resolve textual ambiguity confidently to conclude that Congress used the word "and" to combine the State-of-incorporation and principal-place-of-business provisions intending for the latter to operate independently of the former, and thereby to expand diversity jurisdiction to reach federally chartered corporations generally. Rather, statutory context is more supportive of the conclusion that Congress used "and" to combine these provisions to make corporations already chartered by a State citizens not only of that State but also of the State of principal place of business.

Nevertheless, to the extent any ambiguity remains, we also consider § 1332(c)(1) in its "broader statutory context." *New York Legal Assist. Grp. v. BIA*, 987 F.3d 207, 216 (2d Cir. 2021) (internal quotation marks omitted).

## 2. Broader Statutory Context

To place § 1332(c)(1) in its broader statutory context, we must begin some four decades before its enactment, with the Supreme Court's 1916 decision in *Bankers' Trust*, 241 U.S. 295. In that case to foreclose a railroad mortgage, the defendant railway "was incorporated under acts of Congress, not under state laws; and its activities and operations were not to be confined to a single state, but to be

30

carried on, as in fact they [were], in different states." *Id.* at 309.[20] Further, Congress had enacted no law providing for the railway to "be regarded as possessing state citizenship for jurisdictional purposes," as it had done "in respect of national banks." *Id.* at 310.[21] In those circumstances, the Supreme Court stated that the federally chartered railway "is not a citizen of any state," and, thus, the suit was not "one between citizens of different states" as necessary to invoke federal diversity jurisdiction. *Id.* at 309–10; *see Navy Federal*, 972 F.3d at 350 (describing *Bankers' Trust* as stating "federal-common-law rule[]").[22]

Following *Bankers' Trust*, Congress appears to have taken no action to extend diversity jurisdiction to federally chartered corporations generally. Quite the contrary, in 1948, Congress narrowed parties' ability to invoke even federal question jurisdiction based on a corporation's federal charter. *See* 28 U.S.C. § 1349 (stating that "district courts shall not have jurisdiction of any civil action by or against any corporation upon the ground that it was incorporated by or under an Act of Congress, unless the United States is the owner of more than one-half of its

---

[20] *Bankers' Trust*'s observation that the federally chartered railway's "activities and operations were not to be confined to a single state" may allude to the "localization exception" discussed *supra* at 7 n.3 and *infra* at 47–51. If so, the Supreme Court casts the exception narrowly by reference to a corporation's "activities and operations" that are "*confined to a single state,*" 241 U.S. at 309 (emphasis added).

[21] *See infra* at 34–36 (citing legislation denominating national banks as well as certain specific federally chartered corporations to be State citizens).

[22] The conclusion that a federally chartered corporation is not a citizen of any state does not mean that it "has no citizenship at all." Dissenting Op., *post*, at 1. It is a "citizen[] of the United States." *Infra* at 34 (quoting Moore & Weckstein, *Corporations and Diversity*, 77 Harv. L. Rev. at 1436 (observing that "federal corporations are for jurisdictional purposes generally regarded as citizens of the United States but not of any one of the individual states")).

capital stock"). The Ninth Circuit would subsequently cite this legislation in declining to recognize diversity jurisdiction over a federally chartered corporation based on its principal place of business in the District of Columbia, explaining that, "[i]f federal corporations whose principal place of business is located in the District of Columbia were to be considered citizens of the District, diversity jurisdiction would be expanded to almost all suits involving federal chartered corporations," such that Congress's "attempt to limit federal court jurisdiction [through § 1349] would be nullified" by "giv[ing] federal jurisdiction[] to almost all suits involving federally chartered corporations." *Hancock Fin. Corp. v. Fed. Sav. & Loan Ins. Corp.*, 492 F.2d 1325, 1329 (9th Cir. 1974); *see* William Baude *et al.*, *Hart & Wechsler's The Federal Courts and the Federal System* 1087 (8th ed. 2025) (posing question whether expanding diversity jurisdiction to federally chartered corporations would comport with § 1349's prohibition of federal question jurisdiction based on federal incorporation unless United States owns majority of capital stock).

We can assume that Congress was aware of both the *Bankers' Trust* rule generally excluding federally chartered corporations from diversity jurisdiction (except, perhaps, when "its activities and operations were . . . confined to a single state," *see* 241 U.S. at 309) and its own statutory limitation on the exercise of federal question jurisdiction with respect to such corporations when, in 1958, it amended § 1332 to include the language here at issue. *See Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 233 (2020) ("We normally assume that Congress is aware of relevant judicial precedent when it enacts a new statute." (internal quotation marks omitted)). In such circumstances, a court can expect that if Congress intends to depart from a common-law rule or established precedent, it will say so clearly. *Cf. Hamilton v. Lanning*, 560 U.S. 505, 517 (2010) (observing that, in light of "historical [bankruptcy] practice, we would expect that, had Congress intended for

'projected' to carry a specialized—and indeed, unusual—meaning . . . Congress would have said so expressly"); *United States v. Texas*, 507 U.S. 529, 534 (1993) (stating that to abrogate federal common-law right with respect to collection of prejudgment interest "statute must 'speak directly' to the question addressed by the common law"). Nowhere in § 1332(c)(1), however, did Congress clearly indicate an intent to codify a judicially recognized localization exception, much less to reach beyond it so as to expand diversity jurisdiction to federally chartered corporations generally based simply on their principal place of business.

With the singular exception of the Fourth Circuit in *Navy Federal*, no Court of Appeals appears to have discerned any such congressional intent in § 1332(c)(1). To the contrary, the Supreme Court, in discussing the history of that statute, has recognized that its purpose was to respond to judicial concern with "too many diversity cases" on federal dockets. *Hertz Corp. v. Friend*, 559 U.S. at 86.[23] Thus, "[w]ith *Bankers' Trust* in the background, many courts [have] concluded"— sometimes even summarily—"that 28 U.S.C. § 1332(c)(1) applie[s] only to state corporations and not to federally chartered corporations or associations." *Hukic v. Aurora Loan Servs.*, 588 F.3d at 428 [7th Cir.]; *see Bernath v. Am. Legion*, 704 F. App'x 917, 918 (11th Cir. 2017) (holding that "American Legion, as a federally chartered corporation, is not considered a citizen of any state unless its activities are sufficiently localized in one state," which was not there the case (internal quotation marks omitted) (alterations accepted)); *Eagle TX I SPE, L.L.C. v. Sharif & Munir Enters., Inc.*, 602 F. App'x 576, 578 (5th Cir. 2015) (stating that "FDIC, like other federally-chartered corporations, is a diversity-destroying 'stateless' entity"); *Hancock Fin. Corp. v. Fed. Sav. & Loan Ins. Corp.*, 492 F.2d at 1329 [9th Cir.] ("[B]ecause the FSLIC is an agency and instrumentality of the federal government

---

[23] *See infra* at 38–46 (discussing legislative history).

it is not a citizen of any particular state for diversity purposes."); *see also Federal Nat'l Mortg. Ass'n v. LeCrone*, 868 F.2d 190, 194 n.5 (6th Cir. 1989) ("doubt[ing]" that federally chartered corporation "can sue or be sued on the basis of diversity jurisdiction").

Leading commentators agree. *See, e.g.*, 15A *Moore's Federal Practice* § 102.56[4] (3d ed. 2025) (observing that federally chartered corporation "organized to conduct business or activities in more than one state is deemed to have only national citizenship. Diversity jurisdiction over a nonlocalized company of this type is generally precluded."); 13F *Wright & Miller's Federal Practice and Procedure* § 3627 (stating as "general rule" that "citizenship of a federal corporation created to operate in one or more states is national only. Such a corporation has no state citizenship unless Congress so enacts." (internal quotation marks omitted) (alterations accepted)); Lund, *Federally Chartered Corporations*, 36 Fla. St. U. L. Rev. at 337 (stating that "§ 1332(c)(1), which defines corporate citizenship, applies only to state-chartered corporations, not to federal corporations"); Moore & Weckstein, *Corporations and Diversity*, 77 Harv. L. Rev. at 1436 (observing that "federal corporations are for jurisdictional purposes generally regarded as citizens of the United States but not of any one of the individual states").

Casting further doubt on the idea that Congress intended § 1332(c)(1)'s principal-place-of-business provision to be construed to operate independently from its State-of-incorporation provision and, thereby, to *extend* diversity jurisdiction to federally chartered corporations generally, is the fact that not only before, but also after, the 1958 amendment adding this subsection, Congress enacted various statutes expressly identifying the federally chartered corporations it wanted to treat as State citizens subject to diversity jurisdiction. *See* 12 U.S.C.

§ 1464(x) (stating, in 2006, that "[i]n determining whether a Federal court has diversity jurisdiction over a case in which a Federal savings association is a party, the Federal savings association shall be considered to be a citizen only of the State in which such savings association has its home office");[24] 28 U.S.C. § 1348 (stating, in 1948, that "[a]ll national banking associations shall, for the purposes of all other actions by or against them, be deemed citizens of the States in which they are respectively located").  Even more particularly, in a 1974 amendment, Congress stated that the Federal National Mortgage Association "shall maintain its principal office in the District of Columbia or the metropolitan area thereof and shall be deemed, for purposes of jurisdiction and venue in civil actions, to be a District of Columbia corporation."  12 U.S.C. § 1717(a)(2)(B).[25]  Similarly, in a 1986 amendment, it stated that the federally chartered Student Loan Marketing Association "shall maintain its principal office in the District of Columbia and shall be deemed, for purposes of venue and jurisdiction in civil actions, to be a resident and citizen thereof."  20 U.S.C. § 1087-2(b)(1).[26]  Likewise, in a 1996 amendment, Congress stated that the federally chartered Telecommunications Development Fund "shall maintain its principal office in the District of Columbia and shall be deemed, for purposes of venue and jurisdiction in civil actions, to be a resident and citizen thereof."  47 U.S.C. § 614(b).[27]  Two years earlier it had stated that "[t]he

---

[24] *See* Financial Services Regulatory Relief Act of 2006, Pub. L. 109-351 § 403, 120 Stat. 1966 (2006) (adding jurisdictional language).

[25] *See* Housing and Community Development Act of 1974, Pub. L. 93-383 § 806, 88 Stat. 633 (1974) (adding jurisdictional language).

[26] *See* Higher Education Amendments of 1986, Pub. L. 99-498 § 439(b)(1), 100 Stat. 1268 (1986) (adding jurisdictional language).

[27] *See* Telecommunications Act of 1996, Pub. L. 104-104 § 714(b), 110 Stat. 56 (1996) (adding jurisdictional language).

principal office and place of business of Amtrak are in the District of Columbia"
and that "Amtrak is a citizen only of the District of Columbia when deciding
original jurisdiction of the district courts of the United States in a civil action." 49
U.S.C. § 24301(b).[28] Leading commentators have noted that such statutory
carveouts are one of two such exceptions to the general rule that federally
chartered corporations may not be sued in diversity (the other exception being
localization). *See* 15A *Moore's Federal Practice* § 102.56[4] (3d ed. 2025) ("[T]he
second exception allows for diversity jurisdiction if Congress has expressly
provided for it."). Congress has enacted no such targeted legislation with respect
to ACS. Its charter does not provide for a principal place of business, much less
does it do so for purposes of establishing venue or jurisdiction in civil actions. *See*
36 U.S.C. §§ 20501–06.

There would have been no need for the cited targeted legislation if Congress
had intended for § 1332(c)(1) to make *all* federally chartered corporations citizens
of the States of their principal place of business for purposes of diversity
jurisdiction. [29] Where the broader statutory context thus shows that Congress

---

[28] *See* Act of July 5, 1994, Pub. L. 103-272 § 24301(b), 108 Stat. 745 (1994).

[29] The dissent submits that some of the targeted statutes simply codify "the general rule
that a federally chartered corporation is a citizen of the state where it has its principal
place of business." Dissenting Op., *post*, at 25. To the extent the "general rule" being
referenced is "localization," we respectfully disagree. A corporation's principal place of
business is one of the factors properly considered in determining if a federally chartered
corporation is so localized as to be deemed a citizen of a State for purposes of diversity
jurisdiction, but the concepts are not identical. Thus, construing § 1332(c)(1)'s principal-
place-of-business provision to apply to federally chartered corporations generally would
not simply codify localization as the dissent further suggests, *see id*. at 20–21 & n.8, but go
beyond it, something for which we discern no congressional intent, *see infra* at 47–53
(discussing dissent's codification arguments further).

knows how to state clearly its intent to extend State citizenship and, thereby, diversity jurisdiction, to particular federally chartered corporations, we will not readily assume its intent to do so more expansively in § 1332(c)(1) through State-of-incorporation and principal-place-of-business provisions that make no mention of federally chartered corporations. *See generally Feliciano v. Dep't of Transp.*, 605 U.S. 38, 49 (2025) (declining to construe word "during" to impose connection requirement between active service and national emergency to obtain differential pay because "other statutes show[] that Congress knows how to impose a substantive connection when it wishes").[30]

In concluding otherwise, *Navy Federal* construed some of the above-cited laws to provide "a fixed, specific provision for D.C. citizenship, which controls over the dynamic, two-pronged, general rule in § 1332(c)(1)." 972 F.3d at 360. The principle that "the specific governs the general" is "a warning against applying a general provision when doing so would undermine limitations created by a more specific provision." *Varity Corp. v. Howe*, 516 U.S. 489, 511 (1996) (internal quotation marks omitted). In short, it tells courts "what to do when conflicting provisions [of law] simply cannot be reconciled." Scalia & Garner, *Reading Law*, at

---

[30] Contrary to the dissent, we do not conclude that only a conjunctive construction of § 1332(c)(1)'s State-of-incorporation and principal-place-of-business provisions avoids rendering the identified targeted statutes superfluous. *See* Dissenting Op., *post*, *at* 24–25. Rather, the discussion in text simply explains why consideration of § 1332(c)(1) in a broader statutory context does not permit us to conclude that Congress joined the statute's two provisions intending for them to operate independently in identifying State citizenship and, thus, to extend diversity jurisdiction to federally chartered corporations generally. If anything, the broader context suggests that was not Congress's intent because it would not have then needed to enact targeted legislation after § 1332(c)(1)'s enactment in 1958.

183. But that is not this case. There is no irreconcilable conflict between the cited specific jurisdictional statutes and § 1332(c)(1).

Thus, review of the broader statutory context does not permit us to conclude that Congress used the word "and" to combine § 1332(c)(1)'s State-of-incorporation and principal-place-of-business provisions, intending for the latter provision to operate independently of the former and, thereby, to extend State citizenship and diversity jurisdiction to federally chartered corporations generally.

## C. Legislative History

In construing a statute, we do not consider legislative history where text and context suffice to identify Congress's intent. *See, e.g.*, *United States ex rel. Weiner v. Siemens AG*, 87 F.4th at 161. But where, as here, a careful review of text and context, together with various rules of statutory construction, do not completely dispel ambiguity, "we may consider legislative history." *Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 101 F.4th 176, 181 (2d Cir. 2024).

Here, the relevant legislative history indicates that Congress intended for the State-of-incorporation and principal-place-of-business provisions of § 1332(c)(1) to operate conjunctively so that the latter would further limit diversity jurisdiction in cases involving State-chartered corporations. Nothing in the history indicates an intent for the provisions to operate independently so as to extend diversity jurisdiction to federally chartered corporations generally. *See* Moore & Weckstein, *Corporations and Diversity*, 77 Harv. L. Rev. at 1438 (noting that Congress simply "did not consider the applicability of [§ 1332(c)(1)] to federal corporations").

In reaching that conclusion, we focus on the Committee Reports for the legislation now codified, *inter alia*, at § 1332(c)(1), mindful that the Supreme Court

38

has identified such reports as "the authoritative source" for identifying Congress's intent because they "represen[t] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation." *Garcia v. United States*, 469 U.S. 70, 76 (1984) (internal quotation marks omitted) (alteration in original); *accord Eisenhauer v. Culinary Inst. of Am.*, 84 F.4th 507, 519 n.57 (2d Cir. 2023) (collecting cases).

Here, Reports submitted to the Senate and House of Representatives by their respective Committees on the Judiciary indicate that the singular concern prompting § 1332(c)(1) was controlling growth in the federal courts' diversity docket. These Reports, which are worded almost identically, state that "[i]n the years following World War II the judicial business of the United States district courts increased tremendously," with "[m]ost of the increase . . . occur[ring] in the diversity of citizenship cases," particularly those "involv[ing] corporations." S. Rep. No. 85-1830 ("S. Rep."), at 2 (1958), *as reprinted in* 1958 U.S.C.C.A.N. 3099, 3100; H.R. Rep. No. 85-1706 ("H.R. Rep."), at 2–3 (1958).[31] The "appointment of additional judges ha[d] not removed many of the basic factors in this problem of increased litigation." S. Rep. at 2; H.R. Rep. at 2–3. Thus, the Committees proposed that Congress address the problem through legislation limiting diversity jurisdiction in suits involving corporations. S. Rep. at 5; H.R. Rep. at 4 (same); *see also Hertz Corp. v. Friend*, 559 U.S. at 86–88 (summarizing history of § 1332(c)(1), including concern with "too many diversity cases" on federal dockets).

In so urging, the Committee Reports make plain that the "corporations" being referenced in the statutory language are State—not federally—chartered

---

[31] Hereafter, we do not include a U.S.C.C.A.N. cite when referencing the Senate Report. No Conference Report was produced for this bill.

corporations.  This is evident from the opening paragraph of the Reports' discussion of "Diversity of Citizenship by Corporations," which states:

> It is now established doctrine that a corporation, for the purposes of jurisdiction, is deemed a citizen of the State in which it is incorporated.  It is by virtue of this rule, which is now long standing and thoroughly imbedded in our jurisdiction, that so-called out-of-State corporations may sue and be sued under the diversity jurisdiction where it is suing or being sued by a citizen of a State other than the State of its incorporation.

S. Rep. at 4 (internal citation omitted); H.R. Rep. at 3–4 (same).  The referenced "established doctrine" plainly pertains only to State-chartered corporations.  The general rule applicable to federally chartered corporations is that stated in *Bankers' Trust*, *i.e.*, such corporations are "not a citizen of any state" and, thus, are unable to sue or to be sued in diversity jurisdiction.  241 U.S. at 309.

So too with the Reports' next paragraph, which identifies the problem flowing from this "established doctrine," specifically, the "fiction of stamping a corporation a citizen of the State of its incorporation," when it is, in fact, "engaged in a local business and in many cases locally owned."  S. Rep. at 4; H.R. Rep. at 4. The Reports state that allowing such a corporation,

> to bring its litigation into the Federal courts simply because it has obtained a corporate charter from another State . . . can hardly be considered fair because it gives the privilege of a choice of courts to a local corporation simply because it has a charter from another State, an advantage which another local corporation that obtained its charter in the home State does not have.

S. Rep. at 4; H.R. Rep. at 4.[32]

No such fictionalized State citizenship and no such unfair advantage pertain to federally chartered corporations, which are generally excluded from diversity jurisdiction except as Congress may expressly authorize. Thus, there is no reason to think that Congress enacted § 1332(c)(1)'s State-of-incorporation and principal-place-of-business provisions intending thereby to expand diversity jurisdiction with respect to such corporations, while at the same time seeking to narrow such jurisdiction with respect to State-chartered corporations.[33]

---

[32] This court echoed Congress's concern in ruling that an inactive corporation was not only a citizen of its State of incorporation, but also a citizen of its last principal place of business. *See Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*, 933 F.2d at 141 ("To allow inactive corporations to avoid inquiry into where they were last active would give them a benefit Congress never planned for them, since under such a rule a defunct corporation, no matter how local in character, could remove a case to federal court based on its state of incorporation.").

[33] Schneiderman acknowledges that "the actual aim" of § 1332(c)(1) was "to curb abuse of diversity by state-chartered corporations." Appellant's Reply Br. at 26. Our dissenting colleague, however, insists that because Congress was pursuing aims equally applicable to federally chartered corporations we can construe the statute to apply to such corporations as well. In support, he identifies Congress's rejection of a proposal to deem a corporation "a citizen of any State in which it is doing business." Dissenting Op., *post*, at 15 (quoting S. Rep. at 20). This, he submits, manifests an intent "to narrow diversity jurisdiction over corporations only to the extent that doing so would limit abusive practices but would not unduly restrict the availability of a federal forum for corporate litigation." *Id.* He asserts that "[t]he competing interest that Congress identified—that the federal courts must provide a forum for corporate litigation marked by salutary procedures and a lack of local bias—implicates federally chartered corporations" as much as state-chartered ones. *Id.* Perhaps so. But it hardly follows that, because Congress

41

That conclusion comports, moreover, with the principal value furthered by diversity jurisdiction, *i.e.*, protecting "out-of-State citizens against the prejudice of local courts and local juries." S. Rep. at 4; H.R. Rep. at 4; *see Hertz Corp. v. Friend*, 559 U.S. at 85 (stating, with reference to enactment of § 1332(c)(1), that "many in Congress and those who testified before it" identified "basic rationale" for diversity jurisdiction as "opening the federal courts' doors to those who might otherwise suffer from local prejudice against out-of-state parties").[34] Federally chartered corporations are presumed not to be affected by such biases precisely because they generally "are not citizens of any state, but have the same relation to one state as to another." *Texas v. Interstate Com. Comm'n*, 258 U.S. 158, 160 (1922);

---

added a principal-place-of-business provision that limited diversity jurisdiction for State-chartered corporations less than it might have, it intended that same provision to expand diversity jurisdiction for federally chartered corporations generally. Whatever benefits a federal forum might afford federally chartered corporations, we know Congress did not think them sufficient to support wholesale federal question jurisdiction, which it abolished, opting instead for targeted legislation. *See supra* at 31–33. Meanwhile, *nothing* in the legislative history indicates that Congress considered federally chartered corporations at all when adding the principal-place-of-business provision to § 1332(c)(1). *See Moore & Weckstein*, 77 Harv. L. Rev. at 1438 (quoted *supra* at 38). Rather, the singular focus of the addition was on State-chartered corporations, specifically curbing *their* abusive use of their States of incorporation to invoke diversity jurisdiction, albeit without "unduly restrict[ing] the availability of a federal forum for corporate litigation." Dissenting Op., *post*, at 15. *See generally Denver Area Educ. Telecommunications Consortium, Inc. v. F.C.C.*, 518 U.S. 727, 757 (1996) ("Congress need not deal with every problem at once" and "must have a degree of leeway in tailoring means to ends." (citations omitted)).

[34] Mindful of these animating concerns, the parties' positions in this case are perplexing. Insofar as ACS submits that this case should properly be brought in New York State court, *see* Oral Argument Tr. at 22:6–20, Schneiderman, a citizen of New York, can hardly claim that he would be prejudiced by that venue. At the same time, it is not clear what objection ACS has to being sued in federal court.

*cf. Commercial Union Ins. Co. v. United States*, 999 F.2d 581, 584 (D.C. Cir. 1993) (reaching same conclusion for federal agencies).[35]

Turning to the fourth paragraph of this section of their Reports, the Committees propose to reduce the federal courts' diversity dockets by adopting a recommendation of the Judicial Conference of the United States urging amendment of § 1332 "so that a corporation shall be regarded *not only* as a citizen of the State of its incorporation, *but also* as a citizen of the State in which it maintains its principal place of business."  S. Rep. at 5 (emphases added); H.R. Rep. at 4 (emphasis added).  The Committees' use of this "not only . . . but also" formulation strongly indicates an intent for § 1332(c)(1)'s State-of-incorporation and principal-place-of-business provisions to operate conjunctively, not independently.  Indeed, the "not only" prong of such a formulation presupposes the existence of a first thing (incorporation by at least one State) to which a second thing is then added (that corporation's State of principal place of business) to form a complete thought.  *See* Garner, *The Chicago Guide to Grammar*, at 146 (identifying "not only . . . but also" as a "correlative conjunction," *i.e.*, "conjunctions used in pairs, often to join successive clauses that depend on each other to form a complete thought").  The complete thought conveyed by § 1332(c)(1) is that, for purposes of diversity jurisdiction, a corporation is first properly identified as a citizen of every State by which it has been incorporated, and then further identified as a citizen of the State where it has its principal place of business.  *See* Bryan A. Garner, *Garner's*

---

[35] While the dissent maintains that "[t]here is no such presumption," *see* Dissenting Op., *post*, at 16, we locate support not only in the quoted language from *Texas v. Interstate Com. Comm'n*, 258 U.S. at 160, but also in recognition that the presumption can be overcome by federal legislation and, possibly, localization properly understood.

*Modern English Usage* 756 (5th ed. 2022) (noting that "not only . . . but also" is comparable to "not only . . . but . . . as well").

Further, in supporting the amendment now codified at § 1332(c)(1), Rep. Kenneth Keating (N.Y.) used the same "not only . . . but also" formulation to confirm what the Committee Reports said about the legislation serving to limit— not to expand—federal diversity jurisdiction. *See* 104 Cong. Rec. 12,688 (1958) (predicting that law would "reduce the number of cases brought into Federal court on the basis of diversity of citizenship" because "a corporation henceforth shall be considered a citizen not only of the State in which it was incorporated, but also of the State where it has its principal place of business"). Such "stand-alone remarks" are not "dispositive" of how Congress intends a statute to operate. *Enterprise Mortg. Acceptance Co., LLC, Sec. Litig. v. Enter. Mortg. Acceptance Co.*, 391 F.3d 401, 408 n.5 (2d Cir. 2004). Nevertheless, we may consider them when, as here, they are consistent with the more authoritative Committee reports. *See City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 404 (2d Cir. 2008). Further, the Supreme Court has itself used the "not only . . . but also" formulation to describe the operation of these two statutory provisions. *See Carden v. Arkoma Assocs.*, 494 U.S. 185, 196 (1990) (stating that Congress amended § 1332(c) in 1958 to provide "that a corporation shall be deemed a citizen not only of its State of incorporation but also of the State where it has its principal place of business" (internal quotation marks omitted)).

Finally, the Committee Reports state elsewhere that a corporation shall be deemed a citizen "*both* of the States of its creation *and* the State in which it has its principal place of business." S. Rep. at 3 (emphases added); H.R. Rep. at 3 (same). The highlighted language is another correlative conjunction, operating to the same effect as "not only . . . but also." *See* Garner, *The Chicago Guide to Grammar*, at 146–

44

47; *Webster's Third New Int'l Dictionary* at 258 (defining "both" as signaling items working together, "without excepting either"). The Judicial Conference of the United States used both these correlative conjunctions in its recommendations to Congress. *See Report of the Proceedings of the Regular Annual Meeting of the Judicial Conference of the United States* 27 (Sept. 1951) (recommending that "in cases based upon diversity of citizenship a corporation shall be deemed a citizen both of the State of its creation and the State in which it has its principal place of business"); *Report of the Proceedings of a Special Session of the Judicial Conference of the United States* 9 (Mar. 1957) (renewing recommendation "that a corporation be deemed to be a citizen not only of the State of its incorporation but also of the State in which it has its principal place of business").

Thus, Congress's own conjunctive characterization of § 1332(c)(1) signals that it intended for the principal-place-of-business provision to provide an additional State of citizenship in addition to that already provided by the corporation's State(s) of incorporation. It did not intend for the principal-place-of-business provision to operate independently so as to confer State citizenship on federally chartered corporations incorporated by no State.

To be sure, Congress did not use "not only . . . but also" in § 1332(c)(1)'s text to signal that the State-of-incorporation and principal-place-of-business provisions operate conjunctively. But neither did it use the word "or" to signal that the provisions operate independently. It used "and." To the extent that, even after reviewing text, statutory context, and background, there remains any ambiguity in that use, Congress's use of correlative conjunctions in the pertinent legislative history signals that it used "and" in § 1332(c)(1) intending for the principal-place-of-business provision to operate in conjunction with, not independently from, the State-of-incorporation provision to which it is joined.

45

And because the text of the latter provision presupposes that the corporation in question has been incorporated by at least one state, *see supra* at 15–18, the State of citizenship identified by the principal-place-of-business provision is necessarily in addition to the State of citizenship already provided by the State(s) of incorporation.

In sum, legislative history convincingly indicates (1) that the concern animating § 1332(c)(1) was the growth in diversity cases involving corporations, a concern that could only pertain to State-chartered corporations because federally chartered corporations are generally excluded from diversity jurisdiction; (2) that Congress sought to remedy the identified concern by combining a new principal-place-of-business provision with the established State-of-incorporation provision so as to identify corporate citizenship in a way that would *narrow* the ability for State-chartered corporations to sue or be sued in diversity jurisdiction; and (3) that, in enacting such legislation, Congress made no mention in text or history of federally chartered corporations, much less indicated any intent to *expand* diversity jurisdiction to reach such corporations in a way not previously authorized.

Thus, when we consider the statutory text in context, in light of the totality of this history, and mindful that Congress alone has the power to expand the jurisdiction of federal courts, *see Snyder v. Harris*, 394 U.S. at 341–42; *accord Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. at 696, we construe § 1332(c)(1) to identify State citizenship only for corporations incorporated by a State or foreign state and not for federally chartered corporations. We therefore conclude that the district court correctly determined that Schneiderman failed to demonstrate diversity jurisdiction with respect to federally chartered ACS and, on that basis, it properly dismissed this action for lack of subject matter jurisdiction.

46

**D. The Dissent's Reliance on "Localization" as a Basis for Diversity Jurisdiction Does Not Persuade**

As earlier noted, in the district court, Schneiderman expressly waived any reliance on a judicially recognized localization exception as a basis for the exercise of diversity jurisdiction over ACS in this case. *See supra* at 7 n.3. He does not contend otherwise on appeal. Nor does he argue on appeal that § 1332(c)(1) effectively codifies the localization exception. Only our dissenting colleague so urges, and in the process accuses us of proceeding on a "pretense" that we lack jurisdiction as to localization. Dissenting Op., *post*, at 32. The dissent's accusation is unwarranted, and its urged arguments are unpersuasive.

**1. The Localization Exception**

The dissent's pretense accusation will not bear close scrutiny as applied to Schneiderman's express waiver of the localization exception as a basis for exercising diversity jurisdiction over ACS.

First, such an accusation finds no support in our obligation to exercise jurisdiction conferred by Congress. "[W]hile federal courts must ensure that they do not *lack* subject-matter jurisdiction, even if the parties fail to identify any jurisdictional defect, there is no corresponding obligation to *find and exercise* subject-matter jurisdiction on a basis not raised by the parties," much less on a basis expressly waived. *Behrens v. JPMorgan Chase Bank, N.A.*, 96 F.4th 202, 206–07 (2d Cir. 2024) (emphasis in original).

47

Nor can it be grounded in an assumption that we have the same discretion to review a waived point as we have to review a forfeited one.[36]  As the Supreme Court has observed, "[t]he terms waiver and forfeiture—though often used interchangeably by jurists and litigants—are not synonymous."  *Hamer v. Neighborhood Housing Servs. of Chicago*, 583 U.S. 17, 20 n.1 (2017).  "Forfeiture is the failure to make the timely assertion of a right; waiver is the intentional relinquishment or abandonment of a known right." *Id.* (internal quotation marks omitted) (alterations accepted).  "[T]his court has discretion to correct errors that were *forfeited* because not timely raised in the district court, but no such discretion applies when there has been true *waiver*."  *United States v. Spruill*, 808 F.3d 585, 596 (2d Cir. 2015) (emphasis in original); *United States v. Yu-Leung*, 51 F.3d 1116, 1121 (2d Cir. 1995) ("[F]orfeiture does not preclude appellate consideration of a claim in the presence of plain error, whereas waiver necessarily extinguishes the claim altogether" (internal quotation marks omitted)).  This principle is not confined to criminal cases, but applies also to civil cases.  *See, e.g., Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72–73 (2013) (stating, in civil context, that party's concession of issue "prevent[s] us from reaching it").

The dissent nevertheless maintains its "pretense" accusation by asserting that what Schneiderman waived was not an "issue" or "claim" (*i.e.*, whether there is diversity jurisdiction in this case), but only an "argument" (*i.e.*, whether the localization exception provides a basis for such jurisdiction).  *See* Dissenting Op., *post*, at 28–29 (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the

---

[36] The dissent appears to have retreated from that earlier urged position.  We discuss the two concepts here to the extent that clarification may be warranted.

independent power to identify and apply the proper construction of governing law.").[37]  The dissent identifies the relevant "issue" here at too high a level of generality.  In *Genesis Healthcare Corp. v. Symczyk*, the Supreme Court recognized that assertions of jurisdiction can raise diverse issues.  569 U.S. at 72–73.  There, an employee suing for damages under the Fair Labor Standards Act might be said to have asserted a claim that she possessed the "legally cognizable interest or personal stake in the outcome of the action" necessary for the exercise of federal jurisdiction.  *Id.* at 71 (internal quotation marks omitted).  When a question arose as to whether a settlement offer of complete relief would moot the action and, thus, terminate the employee's interest in the litigation, the Supreme Court did not identify the employee's concession of the point as the waiver of only an argument.  Rather, upon the lower court's finding that the employee had received such an offer, the Supreme Court ruled that the employee's "waiver of the issue"—*i.e.*, the issue of whether an offer would moot the action and terminate her interest— precluded consideration of her argument that an "unaccepted" offer does not render an action moot.  *Id.* at 71–72.  So here, Schneiderman's assertion of diversity jurisdiction does not present a single issue or claim.  Rather, an assertion of diversity jurisdiction based on a statute, *i.e.*, § 1332(c)(1), presents a distinct issue from an assertion of diversity jurisdiction based on a judicially recognized localization exception to the general rule that federally chartered corporations are not subject to such jurisdiction, both of which present distinct issues from an

---

[37] We note that, in *Kamen,* the Supreme Court made this pronouncement in the context of a forfeited argument, not a waived one.  *See* 500 U.S. at 99.  When the Court did apply the rule to an "expressly disavowed" argument, the case was one in which the matter was appropriately reached in any event because it had been addressed by the lower court.  *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. at 379.  Here too, we review the waived statutory basis for diversity jurisdiction passed on by the district court.  *See supra* at 10– 11 n.6.

assertion of diversity jurisdiction dependent on a court's pronouncement of a new exception to the general rule.  Each of these claimed bases for diversity jurisdiction requires its own legal analysis and arguments.  Thus, even assuming that the issue-argument distinction emphasized by the dissent applies to expressly waived points not passed on by the district court, Schneiderman's waiver of the issue of a localization basis for diversity jurisdiction precludes review on appeal.

Finally, even if we had the discretion to review the waived localization issue, we would not exercise that discretion here where Schneiderman not only waived the point in the district court but abandoned it on appeal.  *See United States v. Prawl*, 149 F.4th 176, 187 (2d Cir. 2025) (stating that "argument[s] not raised on appeal [are] generally deemed abandoned" (internal quotation marks omitted)).  While we have sometimes exercised our discretion to review an abandoned argument where it "presents a question of law and there is no need for additional fact-finding[,] or where manifest injustice otherwise would result," even when "these conditions obtain," we have "decline[d] to exercise our discretion."  *Id.* (internal quotation marks omitted).

Here, these conditions do not obtain.  The dissent does not—and cannot—argue that review is necessary here to prevent an injustice to Schneiderman.  The dismissal of this case for lack of diversity jurisdiction leaves Schneiderman, a New York resident, to pursue his New York State law claim in a New York State court, hardly a forum likely to be biased against *him*, the concern underlying diversity jurisdiction.  *See supra* at 42 n.34.  Instead, the dissent maintains that review is warranted because localization presents only a question of law "closely related to the statutory question the majority addresses."  *See* Dissenting Op., *post*, at 32.  But as the lengthy opinions in this case show, the question of law is not one that is easily resolved.  More to the point, the legal question pertains only to the exercise

50

of our diversity jurisdiction and is entirely irrelevant to Schneiderman's state law claim, which can be heard in state court. Such circumstances do not support review of an abandoned claim. As for disputes of fact, given the numerous factors—beyond a corporation's principal place of business—pertinent to the localization exception, *see infra* at 52–53, we are not persuaded that it weighs in favor of our reviewing an abandoned claim.

In sum, as a matter of both true waiver and the exercise of discretion, we do not here consider a localization-exception basis for diversity jurisdiction not urged on appeal by Schneiderman.

### 2. Codification of Localization

In construing § 1332(c)(1), we have not disavowed jurisdiction to consider whether Congress's intent was to codify localization as a basis for the exercise of diversity jurisdiction. Rather, we have noted that only the dissent raises the possibility of such codification. Schneiderman makes no such argument on appeal. The argument thus being abandoned, its review is left to our discretion. *See United States v. Prawl*, 149 F.4th at 187. For reasons just stated, we need not exercise that discretion to avoid an injustice to Schneiderman. Nor are we persuaded to do so by the dissent's discussion of codification. *See* Dissenting Op., *post*, at 20–21 (submitting that Congress's "codification of the Federal common law" pertaining to localization would not require showing that Congress intended to expand diversity jurisdiction (internal quotation marks omitted)).

The likelihood that Congress intended codification is here undermined by the fact that the relevant Committee Reports discussed *supra* at 39–44 not only make no reference to localization, but also specifically ground the added principal-place-of-business provision in "Federal statute[s] such as the [venue] provisions

51

of the Bankruptcy Act." S. Rep. at 5; H.R. Rep. at 4; *see* Moore & Weckstein, *Corporations and Diversity*, 77 Harv. L. Rev. at 1439 n.72 (observing that "[principal-place-of-business] phrase is employed as a criterion of venue in a variety of statutes," such as Bankruptcy and Securities Exchange Acts). Nor are the concepts of localization and principal place of business so obviously identical as to admit an inference of incorporation. Every functioning corporation has a principal place of business, even if it operates nationwide. This is evident in Congress's use of the definite article in referring to "the State" where a corporation has its principal place of business. 28 U.S.C. § 1332(c)(1). It is further evident in the Supreme Court's "nerve center" test for identifying a corporation's principal place of business, which asks only "where a corporation's officers direct, control, and coordinate the corporation's activities," generally the corporation's headquarters, "provided that the headquarters is the actual center of direction, control, and coordination." *Hertz Corp. v. Friend*, 559 U.S. at 93. But not every federally chartered corporation is so *localized* as to warrant an exception from the general *Bankers' Trust* rule that it is a citizen of no State. *See* 241 U.S. at 309 (referencing possible exception when corporation's "activities and operations" are "confined to a single state"). Many factors are properly considered in determining whether a federally chartered corporation can be deemed a State citizen based on localization, the principal place of business being only one. *See, e.g., Loyola Fed. Sav. Bank v. Fickling*, 58 F.3d 603, 606 (11th Cir. 1995) ("A variety of factors are relevant to this [localization] inquiry, such as the corporation's principal place of business, the existence of branch offices outside the state, the amount of business transacted in different states, and any other data providing evidence that the corporation is local or national in nature."); *see also Parks Heritage Fed. Credit Union v. Fiserv Sols., Inc.*, No. 16-CV-7734, 2017 WL 74280, at *4 (S.D.N.Y. Jan. 4, 2017) (noting that federally chartered corporation "is not 'necessarily localized in the

state in which its principal place of business is located'" (quoting *Little League Baseball, Inc. v. Welsh Publ'g Grp., Inc.*, 874 F. Supp. 648, 653 (M.D. Pa. 1995))). Thus, because § 1332(c)(1)'s principal-place-of-business provision in fact reaches farther than the localization exception, we reject the dissent's suggestion that codification can be assumed because there would be no resulting significant expansion in diversity jurisdiction.

Accordingly, we do not construe § 1332(c)(1) to codify a localization exception warranting the exercise of diversity jurisdiction over ACS in this case, nor do we ourselves consider whether a waived common-law localization exception might itself permit us to exercise such jurisdiction. Rather, for the reasons stated in this opinion, we conclude that the principal-place-of-business provision of § 1332(c)(1) does not operate independently to support jurisdiction over ACS in this case, and, therefore, we affirm the district court's dismissal of this action against ACS for lack of jurisdiction.

## II.    Denial of Post-Judgment Motions

Schneiderman also challenges the district court's denial of his final *pro se* post-judgment motion, which the district court liberally construed to seek reconsideration of dismissal of his case, reopening of his case for further discovery, and permission to file a fourth amended complaint. *See* Fed. R. Civ. P. 59(e), 60(b). We review this denial only for abuse of discretion. *See Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004) (Rule 59(e)); *Grace v. Bank Leumi Tr. Co. of N.Y.*, 443 F.3d 180, 187 (2d Cir. 2006) (Rule 60(b)); *Van Buskirk v. United Grp. of Cos., Inc.*, 935 F.3d 49, 53 (2d Cir. 2019) (reconsideration). We identify no such abuse here.

As we have noted, "the standard for granting [a Rule 59 motion for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked."

53

*Analytical Survs., Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012), as amended July 13, 2012 (internal quotation marks omitted) (alteration in original). Likewise, "Rule 60(b) provides a mechanism for extraordinary judicial relief [available] only if the moving party demonstrates exceptional circumstances," *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 126 (2d Cir. 2009) (internal quotation marks omitted) (alteration in original), and "[a] motion for reconsideration is an extraordinary request that is granted only in rare circumstances, such as where the court failed to consider evidence or binding authority," *Van Buskirk v. United Grp. of Cos., Inc.*, 935 F.3d at 54.

Schneiderman has not shown that he is entitled to such extraordinary relief. Specifically, he does not demonstrate that the district court overlooked any controlling authority. Rather, he suggests that the court overlooked the fact that, prior to dismissal, he had been pursuing discovery into the viability of a renewed Rehabilitation Act claim. *See* Appellant Br. at 27–31. The record is to the contrary.

When the district court denied Schneiderman's first motion for reconsideration and reopening, it indicated its awareness of "the fact that [prior to dismissal, Schneiderman] was engaged in discovery to determine the feasibility of reinstating the previously dismissed Rehabilitation Act claim." Order Denying First Mot. Reopen at 8, *Schneiderman*, Dkt. No. 83. It observed that the potential viability of such a claim had also been "raised in plaintiff's opposition to defendant's pre-motion conference request and in stricken correspondence that was sent to the Court by plaintiff's counsel while the motion to dismiss the Third Amended Complaint was *sub judice*." *Id.* at 8–9. Nevertheless, the district court noted that Schneiderman had failed to raise the possibility of such a claim in opposing ACS's motion to dismiss. *See id.* In any event, it deemed the issue irrelevant because the dismissed Third Amended Complaint alleged only state law

54

claims and, before its dismissal, Schneiderman never sought leave to file a Fourth Amended Complaint stating any federal claims. *See id.* In denying Schneiderman's second motion for reconsideration and reopening, the district court reiterated this conclusion. Order Denying Second Mot. Reopen at 9, *Schneiderman*, Dkt. No. 89 ("The papers that plaintiff filed in opposition to the motion to dismiss did not mention the ongoing discovery into the Rehabilitation Act Claim.").

On this record, we are satisfied that the district court considered the facts that Schneiderman claims it overlooked, such that we identify no abuse of discretion in its denial of his final motion for reconsideration of dismissal and reopening of his case.

## CONCLUSION

To conclude,

1. Upon consideration of the text, context, and history of 28 U.S.C. § 1332(c)(1), we conclude that the statute identifies State citizenship for purposes of diversity jurisdiction by reference to a corporation's principal place of business only for corporations that have been chartered by a State or foreign state, not for federally chartered corporations.

2. Because defendant ACS is a federally chartered corporation not incorporated by any State, plaintiff Schneiderman cannot demonstrate the diversity of citizenship necessary for federal jurisdiction in this action. Thus, the district court correctly dismissed this action.

3. The district court also acted within its discretion in denying Schneiderman's motion to reconsider the dismissal judgment and to reopen the case.

Accordingly, we **AFFIRM** the challenged judgment and order of the district court in all respects.

21-2737-cv (L), 24-274-cv (Con.)
*Schneiderman v. American Chemical Society*

MENASHI, *Circuit Judge*, dissenting:

The federal diversity statute provides that "a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated *and* of the State or foreign state where it has its principal place of business." 28 U.S.C. § 1332(c)(1) (emphasis added). The majority interprets the word "and" to limit the application of § 1332 only to those corporations that have both a state of incorporation and a principal place of business. Because a federally chartered corporation has not been incorporated by either an American state or a foreign state, the majority decides that it has no citizenship at all under § 1332.

That strange conclusion does not follow from the text, structure, or history of the statute. The language of § 1332(c)(1) straightforwardly deems a federally chartered corporation to be a citizen of the state where it has its principal place of business, and the common law background against which the statute was enacted reinforces that interpretation. The American Chemical Society ("ACS") is a citizen of the District of Columbia, where it has its principal place of business. The district court erred in dismissing the complaint on the ground that ACS has no citizenship. The majority compounds the error by adopting an idiosyncratic interpretation of the diversity statute and creating a direct split with the Fourth Circuit. I dissent.

## I

"As always, we start with the text." *Campos-Chaves v. Garland*, 144 S. Ct. 1637, 1647 (2024). The text of § 1332(c)(1) unambiguously applies to all corporations, including federally chartered corporations. Section 1332(c)(1) provides that a corporation is a

citizen of (1) "every State and foreign state by which it has been incorporated" and (2) "the State or foreign state where it has its principal place of business." 28 U.S.C. § 1332(c)(1). The first basis for corporate citizenship does not apply to a federally chartered corporation. But the statute deems a federally chartered corporation to be a citizen of the state where it has its principal place of business. Each of the two statutory bases independently confers citizenship, and nothing in the statute prevents one from supplying citizenship when the other does not.

The majority correctly observes that the statute makes "a corporation a citizen not only of every State by which it has been incorporated … but also of the State where it has its principal place of business." *Ante* at 17-18. But the majority makes an unjustified logical leap when it concludes that to have any state citizenship at all, a corporation must have *both* a state of incorporation and a state where it has its principal place of business. That conclusion lacks support in the statutory text, statutory structure, and legislative history.

**A**

The interpretation of the majority conflicts with the statutory text. The statute provides that a corporation is "a citizen of every State and foreign state by which it has been incorporated *and* of the State or foreign state where it has its principal place of business." 28 U.S.C. § 1332(c)(1) (emphasis added). The Fourth Circuit has observed that "[t]he plain meaning of *and* in context here is 'in addition to.'" *Navy Federal Credit Union v. LTD Fin. Servs., LP*, 972 F.3d 344, 350 (4th Cir. 2020). A corporation is a citizen of every state by which it has been incorporated *in addition to* the state where it has its principal place of business. Even though there is no state by which it has been incorporated, a federally chartered corporation is a citizen of the state

2

where it has its principal place of business because "when we add something to nothing, something remains." *Id.*

The majority rejects this straightforward interpretation because it is mystified by the word "and." The majority detects "textual ambiguity as to how the word 'and' combines § 1332(c)(1)'s principal-place-of-business provision with its State-of-incorporation provision." *Ante* at 14. The majority acknowledges that Congress *might* have used "and" to indicate two possibilities, "such that the statutory provisions operate as independent alternatives." *Id.* at 18. But it cannot be certain because "the word 'and' can operate as a sort of linguistic chameleon." *Id.* at 20. The majority notes that its description of "and" as a "chameleon" echoes the Fourth Circuit and the Supreme Court. *Id.* at 13 n.7. But both of those courts used that description to explain why it is not especially difficult to understand the meaning of "and." For chameleons, "the color of their surroundings determines their character." *Navy Federal*, 972 F.3d at 357. A linguistic chameleon, therefore, "must draw its meaning from its context." *Kucana v. Holder*, 558 U.S. 233, 245 (2010) (quoting *Ardestani v. INS*, 502 U.S. 129, 135 (1991)). Instead of recognizing that we can understand how "and" operates by looking at the word in context, the majority throws up its hands at an apparently irresolvable textual ambiguity that requires the resort to legislative history.

But we always understand words in context. That is not a reason to conclude that a text lacks a discernable meaning. The majority's inability to understand "and" in § 1332(c)(1) is "contrary to our common experience as people who communicate in English," let alone to our experience as judges who interpret much more

3

complicated statutes. [1] The interpretation of statutes "has been, 'emphatically,' 'the province and duty of the judicial department' for at least 221 years." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)). In discharging that duty, "[w]e can conclude that the language is ambiguous only after exhausting all the traditional tools of construction." *Quituizaca v. Garland*, 52 F.4th 103, 109 (2d Cir. 2022) (internal quotation marks and alteration omitted). Those tools reveal that "and" in this statute links two alternatives. In my view, "Congress has conveyed its purpose clearly," so I would not "manufacture ambiguity where none exists." *United States v. Culbert*, 435 U.S. 371, 379 (1978).

**1**

The confusion that the majority perceives from contemplating "and" in the abstract is easily resolved by looking at the word in the context of § 1332(c)(1). *See Reno v. Koray*, 515 U.S. 50, 56 (1995) ("[I]t is a fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.") (internal quotation marks omitted). As the Fourth Circuit recognized, each clause in § 1332(c)(1)—the state-of-incorporation clause and the principal-place-of-business clause—is structurally independent. *See Navy Federal*, 972 F.3d at 357. Each clause provides a basis for conferring corporate citizenship, and "[t]he parallel use of the preposition 'of' confirms that both clauses (really, adjectival phrases) are directed toward the word 'citizen,' not one another." *Id.* So the

---

[1] Raymond M. Kethledge, *Ambiguities and Agency Cases: Reflections After (Almost) Ten Years on the Bench*, 70 Vand. L. Rev. En Banc 315, 319 (2017).

way in which "and" combines the two clauses creates alternative and independent bases of citizenship.

The Supreme Court has told us to determine "what the 'and' in [a statute] connects" by "reviewing text in context." *Pulsifer v. United States*, 144 S. Ct. 718, 726 (2024). The majority, however, finds the context as befuddling as the word itself. The majority argues that because § 1332(c)(1) refers to "every State" in which a corporation "has been incorporated," the statute "presupposes that the corporation in question is one that has been incorporated by *some* State." *Ante* at 16. But that is not true. We all agree that "'[e]very' is commonly defined as 'being each individual or part of a class or group whether definite or indefinite in number without exception.'" *Id.* (quoting *Every*, Webster's Third New International Dictionary 788 (1993)). As used in § 1332(c)(1), the word "every" ensures that a corporation will be deemed to be a citizen of *all* American states and foreign states by which it has been incorporated.

That usage is consistent with the possibility that the total number of such states will be "a null set." *Navy Federal*, 972 F.3d at 356. If the rules of a competition provided that "every competitor who achieves a perfect score will receive a prize," no one would say that a perfect score must be awarded at each competition. In the same way, the state-of-incorporation clause does not suggest that a corporation must be incorporated by an American state or a foreign state for § 1332(c)(1) to apply.[2]

---

[2] The majority complains that this hypothetical does not closely track the language of § 1332(c)(1). *See ante* at 18 n.10. But the point here is that— contrary to the suggestion of the majority—the word "every" does not presuppose that there must be a state of incorporation. If the rule said that "a competitor will receive a prize for every competition in which he has shown good sportsmanship and for a competition in which he receives a

The majority also emphasizes the absence of punctuation between the two clauses. The majority reasons that if Congress intended the clauses to operate independently, it would have inserted a semicolon or a comma. *See ante* at 22-24 & n.15. Here is what adding a semicolon would look like: "a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated[;] and of the State or foreign state where it has its principal place of business." 28 U.S.C. § 1332(c)(1). That rendition of the statute is ungrammatical. "[A] semicolon is most commonly used between two independent clauses not joined by a conjunction to signal a closer connection between them than a period would." Chicago Manual of Style § 6.60 (18th ed. 2024). The two clauses of § 1332(c)(1) are *not* grammatically independent and *are* joined by a conjunction—the word "and." So a semicolon would be improper. The majority observes that a comma precedes "a conjunction introducing an independent clause." *Ante* at 22 (quoting William Strunk, Jr. & E.B. White, Elements of Style 5 (4th ed. 2000)). But the word "and" in § 1332(c)(1) does *not* introduce a grammatically independent clause, so a comma would also be improper. The statute does not include a semicolon or a comma because Congress understands how punctuation works.

The text and context of § 1332(c)(1) make plain that the state-of-incorporation and principal-place-of-business clauses operate independently. The attempt of the majority to "manufacture ambiguity" does not succeed. *Culbert*, 435 U.S. at 379.

---

perfect score"—language that closely tracks § 1332(c)(1)—no one would deny a prize to a good sportsman who missed a target.

In addition to the structural independence of the two clauses, the clauses are logically independent. "[A] corporation's place of incorporation does not depend on the location of its headquarters— nor does the place of its headquarters turn on the location of its incorporation." *Navy Federal*, 972 F.3d at 358. There is no relationship between the state by which a corporation has been incorporated and the state where it has its principal place of business. A corporation incorporated in Greece and headquartered in New Jersey can decide tomorrow to re-incorporate in South Dakota and move its headquarters to Liberia. *See Hertz Corp. v. Friend*, 559 U.S. 77, 86 (2010) ("Since the Supreme Court has decided that a corporation is a citizen … it has become a common practice for corporations to be incorporated in one State while they do business in another.") (quoting S. Rep. No. 72-530, at 4 (1932)). Because nothing about the practice of corporations connects the state of incorporation to the principal place of business, there is no reason to think that Congress sought to deem a corporation to have citizenship on one basis only if it also has citizenship on the other basis.

In fact, courts have recognized the possibility that a corporation may have citizenship based on only one of the bases specified in § 1332(c)(1). The Third Circuit has concluded that "an 'inactive' corporation (that is, a corporation conducting no business activities) has no principal place of business, and is instead a citizen of its state of incorporation only." *Midlantic Nat'l Bank v. Hansen*, 48 F.3d 693, 696 (3d Cir. 1995). And the Eleventh Circuit has likewise held that "a dissolved corporation has no principal place of business" and "is therefore only a citizen" of the state by which it was incorporated. *Holston Invs., Inc. B.V.I. v. LanLogistics Corp.*, 677 F.3d 1068, 1071 (11th

Cir. 2012). These cases reflect the understanding that the two bases of corporate citizenship operate independently.

The majority insists that the Third Circuit did not endorse "application of the principal-place-of-business provision to confer State citizenship on corporations not incorporated by any State." *Ante* at 26 n.17. But the word "and" needs to work both ways. If the word "and" signifies "in conjunction with"—as the majority claims it does—then a corporation without a principal place of business cannot be a citizen even of the state by which it was incorporated. I do not believe that § 1332(c)(1) requires that odd result.

And our own precedent forecloses that conclusion. We have recognized that the diversity statute applies to a corporation for which one of the bases of citizenship yields a null set. Our court has held that "the place an inactive corporation last transacted business is relevant in determining diversity jurisdiction" because "a defunct corporation" might still be "local in character." *Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*, 933 F.2d 131, 141 (2d Cir. 1991). That is, even when a corporation has no principal place of business, it may still be a citizen of one or more states under § 1332(c)(1). Other courts have agreed that whether an inactive corporation has a principal place of business depends on the circumstances. *See, e.g., Athena Auto., Inc. v. DiGregorio*, 166 F.3d 288, 291-92 (4th Cir. 1999) (concluding that an inactive corporation "was unquestionably a citizen of Georgia, its state of incorporation," but that "it did not have its principal place of business in Maryland" because "all business activity in Maryland ended" even though its "principal, indeed, only place of business was Maryland" while it was active); *Harris v. Black Clawson Co.*, 961 F.2d 547, 551 (5th Cir. 1992) ("[W]here a corporation has been inactive in a state for a substantial period of time … that state is not the corporation's principal place of business.").

Courts have thus considered the application of § 1332(c)(1) to a corporation that may lack citizenship under one of the clauses. But no court has concluded that such a corporation is a citizen of no place at all. Because the clauses are structurally and logically independent, it is possible to have citizenship based on one clause but not the other.

The majority seems to agree that the clauses are logically independent. *See ante* at 24. But the majority nevertheless asserts that the logical independence "tells us nothing about whether Congress used the word 'and' in § 1332(c)(1) intending for these locations to be considered in conjunction with one another or independently in identifying States of corporate citizenship." *Id.* Of course it does. The independence of the clauses means that there is no reason to read into the statute an intention for the clauses to operate conjunctively. The majority observes that interpreting the clauses "to operate in conjunction" would not render "superfluous" other language in § 1332(c)(1). *Id.* at 24-25. But the problem with judges adding requirements beyond the text of the statute is not usually that doing so renders part of the statute superfluous. The problem is that doing so effectively adds language that Congress did not enact.

The majority says that its conjunctive interpretation "logically comports with precedent recognizing that § 1332(c)(1)'s two provisions work in tandem to confer 'dual citizenship' on State incorporated corporations—thereby limiting their ability to sue and to be sued in diversity jurisdiction." *Id.* at 25. But no one disputes that § 1332(c)(1) deems a corporation to be a citizen of both the state by which it has been incorporated and the state where it has its principal place of business. *See Hertz*, 559 U.S. at 86-87 (recounting the history of § 1332(c)(1)). The expectation that a corporation will generally receive citizenship under both clauses does not mean that Congress intended there to be no diversity jurisdiction when a corporation has

9

citizenship pursuant to one clause but not the other. *Cf. id.* at 86 ("The committee recommended against eliminating diversity cases altogether.").

Congress wrote a simple statute that is easy to apply. The strained attempt of the majority to complicate the statute proves that ambiguity is lacking.

**B**

The use of "and" in other parts of § 1332(c)(1) confirms that it means "in addition to." "A term appearing in several places in a statutory text is generally read the same way each time it appears." *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994). In § 1332(c)(1), the word "and" consistently means "in addition to" rather than "in conjunction with."

The first clause of the statute provides that "a corporation shall be deemed to be a citizen of every State *and* foreign state by which it has been incorporated." 28 U.S.C. § 1332(c)(1) (emphasis added). Everyone agrees that this clause means that a corporation is a citizen of *any* American state or foreign state by which it was incorporated; it "may be a citizen of a domestic state, a foreign state, or both." *Navy Federal*, 972 F.3d at 358. If the majority were correct about the meaning of "and," however, the federal diversity statute "would apply only to entities incorporated *both* domestically and overseas," which would exclude "most corporations." *Id.* (emphasis added).[3]

---

[3] The majority agrees that the "and" between "State" and "foreign state" operates disjunctively "to confer citizenship—independently—on every corporation chartered by a State and on every corporation chartered by foreign states, not only on a State-and-foreign-state-chartered corporation." *Ante* at 29. But it discounts the relevance of this point because the word "every" helps to indicate "Congress's intent to reach comprehensively." *Id.*

Then there is the clause conferring citizenship on insurers. The statute provides that an insurer, "whether incorporated or unincorporated," is a citizen of (1) "every State and foreign state of which the insured is a citizen," (2) "every State and foreign state by which the insurer has been incorporated," "and" (3) "the State or foreign state where the insurer has its principal place of business." 28 U.S.C. § 1332(c)(1). The majority's interpretation of "and" does not work here either: An unincorporated insurer will never have a state of incorporation, so under the reasoning of the majority it would never have any citizenship—despite the express application of § 1332(c)(1) to both incorporated and unincorporated insurers. In this way, the interpretation of the majority causes superfluity after all. "[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 824 (2018) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)). It is possible to avoid rendering the reference to unincorporated insurers superfluous only by understanding "and" to mean "in addition to."

---

That objection misses the point, which is that the word "and" is used consistently throughout § 1332(c)(1) to identify independent alternatives. If the statute deemed a corporation a citizen "of a State and a foreign state by which it has been incorporated," the word "and" still would indicate alternatives. The word "every" avoids the suggestion that there will be at most one state of incorporation. Moreover, it is incorrect that there are no textual cues that apply to "the use of 'and' to join § 1332(c)(1)'s principal-place-of-business provision to this State-of-incorporation provision." *Id.* There is the repetition of the preposition "of": "a corporation shall be deemed to be a citizen *of* every State and foreign state by which it has been incorporated and *of* the State or foreign state where it has its principal place of business." 28 U.S.C. § 1332(c)(1) (emphasis added). The repetition indicates that these are separate and independent citizenships. *See Navy Federal*, 972 F.3d at 357.

The majority sidesteps the consistent usage canon by insisting that the "canon is 'mostly applied to terms with some heft and distinctiveness, whose use drafters are likely to keep track of and standardize.'" *Ante* at 27 (quoting *Pulsifer*, 144 S. Ct. at 735). And the majority asserts that "[p]lainly, 'and' is not a word of heft and distinctiveness." *Id.* at 28. Given all the effort the majority devotes to expounding the meaning of "and," I would have expected the majority to regard that word as especially hefty in the context of this statute. The majority holds that the word "and" determines which corporations may be sued in federal court and which are beyond the reach of federal jurisdiction. That is a significant amount of heft.

If "a court can sometimes demand harmonization of 'and's and 'or's," *Pulsifer*, 144 S. Ct. at 735, then surely the court would want to do so here, where the meaning of "and" is so consequential. Instead, the majority discounts every interpretive confirmation that the statute means what it says. In the majority's view, no tool of statutory interpretation can overcome the irreducible textual ambiguity that the majority assumes is reflected in the word "and."

## C

Following its "disregard of the rules of statutory interpretation," the majority embarks on "a selective tour through the legislative history." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019). The majority claims that the legislative history shows that Congress intended "the State-of-incorporation and principal-place-of-business provisions of § 1332(c)(1) to operate conjunctively so that the latter would further limit diversity jurisdiction in cases involving State-chartered corporations." *Ante* at 38. The majority identifies committee reports that "convincingly indicate[]" that Congress worried about "the growth in diversity

12

cases involving corporations." *Id.* at 46. For that reason, Congress included the two bases of corporate citizenship to "*narrow* the ability for State-chartered corporations to sue or be sued in diversity jurisdiction," but it "made no mention in text or history of federally chartered corporations." *Id.* According to the majority, the exclusion of federally chartered corporations from federal diversity jurisdiction "comports … with the principal value furthered by diversity jurisdiction, *i.e.*, protecting 'out-of-State citizens against the prejudice of local courts and local juries.'" *Id.* at 42 (quoting S. Rep. No. 85-1830, at 4 (1958), *as reprinted in* 1958 U.S.C.C.A.N. 3099, 3102).

This is not how we interpret statutes. "Even those of us who sometimes consult legislative history will never allow it to be used to 'muddy' the meaning of 'clear statutory language.'" *Food Mktg. Inst.*, 139 S. Ct. at 2364 (quoting *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011)). But even apart from that problem the analysis fails on its own terms.

First, the goal of narrowing diversity jurisdiction for corporations does not reveal how Congress understood the amended statute to apply to federally chartered corporations. We know that Congress intended to reduce the volume of diversity cases by establishing two bases of corporate citizenship. *See Hertz*, 559 U.S. at 86-88.[4] As the majority admits, however, the legislative history says nothing about federally chartered corporations. And the particular mischief at which the legislation was directed did not involve

---

[4] *See also* S. Rep. No. 85-1830, at 5 ("[T]he Judicial Conference of the United States has recommended that the law be amended so that a corporation shall be regarded *not only* as a citizen of the State of its incorporation *but also* as a citizen of the State in which it maintains its principal place of business.") (emphasis added).

13

federally chartered corporations.[5] Congress was not concerned with corporate diversity suits in general. It was focused on the abusive situation in which "a local institution, engaged in a local business and in many cases locally owned," could "bring its litigation into the Federal courts simply because it has obtained a corporate charter from another State." S. Rep. No. 85-1830, at 4. The objective of Congress to limit that abuse does not imply that it wanted *sub silentio* to exclude federally chartered corporations from the diversity statute.

Second, "the principal value furthered by diversity jurisdiction," *ante* at 42, does not mean that § 1332(c)(1) implicitly excludes federally chartered corporations. The Senate Report explained that "[t]he underlying purpose of diversity of citizenship legislation … is to provide a separate forum for out-of-State citizens against the prejudices of local courts and local juries by making available to them the benefits and safeguards of the Federal courts." S. Rep. No. 85-1830, at 4. Congress thought this purpose was frustrated when a local corporation strategically evaded its local court through incorporation in a second state. But when it adopted § 1332(c)(1), Congress did not respond to this problem by restricting diversity jurisdiction as much as possible. "[N]o legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the

---

[5] *See Bond v. United States*, 572 U.S. 844, 860 (2014) (interpreting a statute "in light of the context from which the statute arose"); *In re Fairfield Sentry Ltd.*, 147 F.4th 136, 159 n.9 (2d Cir. 2025) ("The mischief rule instructs an interpreter to consider the problem to which the statute was addressed, and also the way in which the statute is a remedy for that problem. The generating problem is taken as part of the context for reading the statute.") (alterations omitted) (quoting Samuel L. Bray, *The Mischief Rule*, 109 Geo. L.J. 967, 968 (2021)).

very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987).

In the amendments to the diversity statute, Congress accommodated competing policy interests. Congress considered—and rejected—"the proposal that a corporation for the purposes of jurisdiction be deemed a citizen of any State in which it is doing business." S. Rep. No. 85-1830, at 20. Congress declined to go that far because it did not want "to deny to business corporations doing business over a wide territory[] the sort of protection which they need against local prejudice and the benefit of the salut[a]ry rules and practice of the Federal courts." *Id.* Congress explained that "to close the doors of the national tribunals to organized business … would create far more evil than it would cure." *Id.* So Congress intended to narrow diversity jurisdiction over corporations only to the extent that doing so would limit abusive practices but would not unduly restrict the availability of a federal forum for corporate litigation. "Many laws are compromises, going thus far and no further in pursuit of a goal." *Hrubec v. Nat'l R.R. Passenger Corp.*, 49 F.3d 1269, 1270 (7th Cir. 1995) (Easterbrook, J.). Contrary to the conclusion of the majority, the legislative history reflects a deliberate balancing of competing interests rather than a single-minded mania for restricting diversity jurisdiction over corporations at all costs.

The competing interest that Congress identified—that the federal courts must provide a forum for corporate litigation marked by salutary procedures and a lack of local bias—implicates federally chartered corporations. The majority asserts that "[f]ederally chartered corporations are *presumed* not to be affected by such biases precisely because they generally 'are not citizens of any state, but have

15

the same relation to one state as to another.'" *Ante* at 42 (emphasis added) (quoting *Texas v. ICC*, 258 U.S. 158, 160 (1922)). There is no such presumption—and it would not make sense to have one. A federally chartered corporation that has its principal place of business in another state is as much an out-of-state party as a state-chartered corporation from a neighboring state. To local players biased toward in-state interests, an out-of-state business that is federally chartered and an out-of-state business that is chartered in another state are both out-of-state businesses. Both may be subject to local prejudice. A federal charter does not provide "the sort of protection" that Congress believed corporations "need against local prejudice." S. Rep. No. 85-1830, at 20.

Even adopting the questionable assumption that we may sidestep the statutory text and instead advance "the principal value furthered by diversity jurisdiction," *ante* at 42, I still would conclude that a federally chartered corporation is a citizen of the state where it has its principal place of business.[6]

---

[6] The majority acknowledges that Congress balanced competing interests when it "limited diversity jurisdiction for State-chartered corporations less than it might have." *Ante* at 42 n.33. But it says that "it hardly follows" that Congress "intended that same provision to expand diversity jurisdiction for federally chartered corporations." *Id.* at 41-42 n.33. The majority then reverts to its own singular focus on the purportedly "singular focus" of Congress to restrict diversity jurisdiction. *Id.* at 42 n.33. But the point is not that Congress's balancing of competing interests *requires* the conclusion that Congress wanted to cover federally chartered corporations. It is that Congress did not embrace a singular policy objective so clearly as to justify a departure from the plain text of the statute. The majority must justify its reliance on an unenacted statutory purpose to override the text that Congress adopted. The majority claims that the plain meaning of § 1332(c)(1) would *expand* diversity jurisdiction over federally chartered corporations in a way that Congress could not have intended. But that claim

16

## II

There is no support in the text, structure, or legislative history for the interpretation of the majority. So the majority travels still further afield. It claims that the "broader statutory context" of § 1332(c)(1)—the state of the law at the time the statute was enacted—indicates that Congress would have wanted the two clauses to operate conjunctively. The majority gets that wrong too.

## A

The majority misunderstands the legal baseline against which § 1332(c)(1) was enacted. The majority posits that the decision of the Supreme Court in *Bankers' Trust Co. v. Texas & Pacific Railway Co.*, 241 U.S. 295 (1916), established that a federally chartered corporation could not be deemed a citizen of any state for purposes of diversity jurisdiction. *See ante* at 30-33. According to the majority, *Bankers' Trust* instituted a "rule generally excluding federally chartered corporations from diversity jurisdiction." *Id.* at 32. On top of that purported rule, Congress decided in 1925 to no longer authorize federal jurisdiction over suits involving a corporation "upon the ground" that it was created by a federal charter. Act of Feb. 13, 1925, Pub. L. No. 68-415, § 12, 43 Stat. 936, 941, *codified as amended at* 28 U.S.C. § 1349. The majority concludes that if Congress had intended for § 1332(c)(1) to depart from the *status quo ante* denying federal jurisdiction to suits involving federally chartered corporations, Congress would have said so more expressly. *Ante* at 32-33.

---

does not justify a departure from the text either because the majority fails to establish that Congress necessarily would have understood § 1332(c)(1) as an expansion. *See infra* Part II.

But that is not the full story. The legal background of § 1332(c)(1) included not only the general rule of *Bankers' Trust* but also the localization doctrine. Pursuant to the localization doctrine, when the activities of a federally chartered corporation "are localized in a particular state, a number of federal courts have deemed the company a citizen of the state in which these activities take place for the purpose of diversity of citizenship jurisdiction." 13F Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 3627 (3d ed. 2025).

The localization doctrine originated at least 150 years ago and has since been recognized by federal courts across the country. One of our predecessors explained the doctrine this way:

> The members of a corporation created by the United States, and located in a particular state, … may as properly be presumed to be citizens of the United States and residents in the state where the corporation is located, so as thereby to be citizens of such state, as the members of a corporation created by a state may be presumed to be citizens of the United States, and residents in the state creating it, and in which it is located, and, therefore, citizens of such state.

*Mfrs.' Nat'l Bank v. Baack*, 16 F. Cas. 671, 674 (C.C.S.D.N.Y. 1871) (Blatchford, J.). [7] Courts came to recognize a principle of the

---

[7] Justice Blatchford wrote this opinion when the applicable law held that a corporation did not have its own citizenship so the citizenship of its shareholders was controlling. The Supreme Court adopted a presumption that all of the shareholders of a corporation were citizens of the state by which it was incorporated. *See Marshall v. Baltimore & Ohio R. Co.*, 57 U.S. (16 How.) 314, 328 (1853) ("The persons who act under these faculties, and use this corporate name, may be justly presumed to be resident in the State which is the necessary *habitat* of the corporation, and where alone they can

"common law to the effect that a Federal corporation localized within one single state is a citizen of that state for jurisdictional purposes." *Elwert v. Pac. First Fed. Sav. & Loan Ass'n*, 138 F. Supp. 395, 402 (D. Or. 1956). Around the time that Congress enacted § 1332(c)(1), the Third Circuit recognized the rule that "localization of activity within a particular state sufficed to make a federal corporation a citizen of that state." *Feuchtwanger Corp. v. Lake Hiawatha Fed. Credit Union*, 272 F.2d 453, 455 (3d Cir. 1959).

The development of the localization doctrine provides important context for understanding the legal baseline Congress faced when it enacted § 1332(c)(1). The Third Circuit recounted that development:

> In early cases which involved federally chartered banks federal courts were disposed to find two separate bases of federal jurisdiction. First, federal question jurisdiction was thought to attach merely because a corporation was federally chartered. Second, a national bank was regarded as a citizen of the place where it did business for purposes of diversity jurisdiction. As the Supreme Court put it in *Petri v. Commercial National Bank*, "suits by or against national banks might therefore be brought or removed upon the ground of diverse citizenship, or of subject-matter". However, in the 1880's concern to reduce the unmanageable and rapidly growing jurisdiction of the federal courts resulted in legislation

---

be made subject to suit; and should be estopped in equity from averring a different domicil as against those who are compelled to seek them there, and can find them there and nowhere else."). When Justice Blatchford referred to a presumption about the state citizenship of the "members of a corporation created by the United States," he was describing the state citizenship of a federally chartered corporation. *See also Orange Nat'l Bank v. Traver*, 7 F. 146, 148-49 (C.C.D. Or. 1881) (endorsing the Blatchford rule).

19

eliminating federal question jurisdiction based merely on federal incorporation and, at the same time, making certain that diversity jurisdiction remained possible by expressly providing, as the courts had already held, that such a corporation should be deemed a citizen of the state of its location. In brief, "so far as the mere source of its incorporation rendered suits to which a national bank might be a party, cognizable by the federal courts, that was taken away, but the jurisdiction which those courts might exercise in such suits when arising between citizens of different states remained unchanged".

*Id.* (citations, footnotes, and alterations omitted). The Third Circuit explained that the Supreme Court in *Bankers' Trust* "recognized and respected" the localization doctrine. *Id.* Although the Court "held that an interstate railroad chartered by the United States was not a citizen of any state for diversity purposes," it was "careful to distinguish this situation from that of a federal corporation, the activities and operations of which were confined to a single state." *Id.* (citing *Bankers' Trust*, 241 U.S. 295).

The development of the localization doctrine shows that when Congress enacted § 1332(c)(1), it might have understood the legal baseline already to include diversity jurisdiction over a federally chartered corporation based on its principal place of business. Interpreting § 1332(c)(1) to deem a federally chartered corporation to have that citizenship does not require a showing that Congress intended "to expand diversity jurisdiction to federally chartered corporations." *Ante* at 33. That application of § 1332(c)(1) might have

20

been "merely a codification of the Federal common law" as it was understood at the time. *Elwert*, 138 F. Supp. at 402.[8]

When § 1332(c)(1) was enacted in 1958, it was at least *unclear* whether diversity jurisdiction excluded federally chartered corporations. Initially, federal courts had jurisdiction over any case involving a federally chartered corporation because the federal charter was understood to raise a federal question.[9] Congress began to limit that principle in the 1880s, and in 1925 Congress declared that "no district court shall have jurisdiction of any action or suit by or against any corporation upon the ground that it was incorporated by or under an Act of Congress." 43 Stat. at 941. Between 1925 and 1958, Congress adopted legislation "expressly making national banks citizens of their state of location for jurisdictional purposes." *Elwert*,

---

[8] *See also* 13F Wright & Miller, *supra*, § 3624 (explaining that the interpretation of § 1332(c) that makes federally chartered corporations "citizens of their principal places of business … would codify the rule that has been applied in some cases that certain federally chartered corporations are citizens of the state in which their activities are localized"); *see also Feuchtwanger Corp.*, 272 F.2d at 456 (explaining that "the most recent amendment of Section 1332 of Title 28, approved July, 25, 1958," came "too late to affect this suit which was filed October 31, 1957," but expecting that the diversity statute would apply to future cases involving federally chartered corporations).

[9] *See Osborn v. Bank of the United States*, 22 U.S (9 Wheat) 738, 823 (1824) ("The charter of incorporation not only creates [the Bank], but gives it every faculty which it possesses. The power to acquire rights of any description, to transact business of any description, to make contracts of any description, to sue on those contracts, is given and measured by its charter, and that charter is a law of the United States."); *Bank of the United States v. Planters' Bank of Georgia*, 22 U.S. (9 Wheat) 904, 910 (1824) ("[T]he charter gives to the Bank a right to sue in the Circuit Courts of the United States, without regard to citizenship.").

21

138 F. Supp. at 401. Courts and commentators disagreed over the import of this legislation for other federally chartered corporations. Some argued that "Congress intended by exclusion to deny to Federal corporations other than national banking associations the attribute of state citizenship for the purposes of the jurisdiction of the Federal courts," but others maintained that the legislation "evinced the policy that a corporation localized in any particular state shall be regarded as a citizen of that state … for the purpose of jurisdiction of Federal courts on the ground of diverse citizenship." *Id.* at 401-02 (quoting *Status, Citizenship, Domicil, Residence, or Location of National Corporations*, 88 A.L.R. 873, 874 (1934)). At the time that Congress adopted § 1332(c)(1), the citizenship status of federally chartered corporations was not as established as the majority suggests.

Given these legal developments in the period preceding the enactment of § 1332(c)(1), it is not possible to conclude with any confidence that either Congress or the courts in 1958 would have understood diversity jurisdiction to exclude federally chartered corporations. At least some authorities held that a federally chartered corporation had state citizenship when its activities were localized within a state. There is no reason to assume that Congress would have considered the application of the principal-place-of-business clause to a federally chartered corporation to expand diversity jurisdiction—let alone that Congress would have considered it to be such a deviation from well-established law as to require a specific provision about federally chartered corporations.[10]

---

[10] The Third Circuit observed at the time that "we are mindful that the present direction of public policy is toward *greater recognition of local corporate activity as equivalent to citizenship for diversity purpose*, albeit the

The history is surely not clear enough to justify a departure from the plain text of § 1332(c)(1). The historical evidence provides at least as much support for the conclusion that Congress meant what it wrote as it does for the conclusion that Congress would have wanted an unwritten limitation on the reach of § 1332(c)(1).

**B**

The majority declines to exercise its "discretion" to consider whether this legal background might affect its analysis of "Congress's intent." *Ante* at 51. The majority thinks it significant that "the relevant Committee Reports" it identifies "make no reference to localization" and that "not every federally chartered corporation is so *localized* as to warrant an exception from the general *Bankers' Trust* rule that it is a citizen of no State." *Id.* at 51-52. That misses the point. Because the majority finds the statute ambiguous, its interpretation of § 1332(c)(1) follows entirely from what it believes Congress *intended* to do based on the "broader statutory context." Yet it sidesteps large chunks of that context.

The majority says that it may ignore the localization doctrine because Schneiderman "waived the point" in the district court. *Id.* at 7 n.3, 50. But its entire discussion of § 1332(c)(1) is an exercise of the court's discretion to "entertain Schneiderman's belated statutory argument *even if waived below.*" *Id.* at 10 n.6 (emphasis added). By deploying waiver principles to pick out particular bits of context, the majority presents a distorted picture of the statute.

The majority's "refusal to consider" the localization doctrine "contrasts sharply with its willingness to take notice" of other

principal aim of legislation reflecting that policy is to restrict federal jurisdiction." *Feuchtwanger*, 272 F.2d at 456 (emphasis added).

23

speculative possibilities about what Congress might have been thinking. *Snyder v. Phelps*, 562 U.S. 443, 469 n.15 (2011) (Alito, J., dissenting). Its conclusion that the word "and" is too complicated to understand contrasts even more sharply with its confidence that it can interpret the convoluted common-law history of corporate citizenship to arrive at a single clear purpose attributable to Congress in 1958. "Color me skeptical." *United States v. Texas*, 143 S. Ct. 1964, 1981 (2023) (Gorsuch, J., concurring in the judgment).[11]

### C

The majority argues that only its interpretation of § 1332(c)(1) avoids rendering superfluous other statutes that specify the citizenship of certain federally chartered corporations. *See ante* at 34-37 (citing examples). But that is wrong.

Congress has provided, for example, that "[a]ll national banking associations shall, for the purposes of all other actions by or against them, be deemed citizens of the States in which they are respectively located." 28 U.S.C. § 1348. According to the majority, this legislation would be unnecessary "if Congress had intended for

---

[11] The majority notes that "the concepts of localization and principal place of business" are not "obviously identical." *Ante* at 52. But a statute that "was intended merely as a codification of judicial precedents" may provide "a more practical test" when precedents dealing with a range of fact patterns are codified into a statutory standard. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17 (1966). The localization doctrine begins with "the corporation's principal place of business." *Loyola Fed. Sav. Bank v. Fickling*, 58 F.3d 603, 606 (11th Cir. 1995); *see also Waldron Midway Enters., Inc. v. Coast Fed. Bank*, No. 91-CV-1750, 1992 WL 81724, at *1 (E.D.N.Y. Apr. 10, 1992) (same); *Sovereign Bank v. Chicago Title Ins. Co.*, No. 00-CV-596, 2000 WL 1100800, at *2 (E.D. Pa. Aug. 7, 2000) (same); *Elwert*, 138 F. Supp. at 397 (same). That primary factor represents a more practical test for implementing the same principle. *See supra* note 8.

§ 1332(c)(1) to make *all* federally chartered corporations citizens of the States of their principal place of business for purposes of diversity jurisdiction." *Ante* at 36.

These statutes are neither superfluous nor contrary to § 1332(c)(1). The statutes "simply give a fixed, specific provision for … citizenship, which controls over the dynamic, two-pronged, general rule in § 1332(c)(1)." *Navy Federal*, 972 F.3d at 360. Rather than rely on the general rule of § 1332(c)(1) that the citizenship of a federally chartered corporation is based on its principal place of business, Congress specified the citizenship of some corporations. "It is a commonplace of statutory construction that the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (alteration omitted) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)). There is no superfluity because these specific statutes supersede § 1332(c)(1). And there is no conflict between a specific statute and a general one. If Congress "has enacted no such targeted legislation with respect to ACS," *ante* at 36, that means that the general rule of § 1332(c)(1) applies.

Some of the specific statutes confirm the general rule that a federally chartered corporation is a citizen of the state where it has its principal place of business. The statutes do not merely confer citizenship but instead specify a principal place of business as the way to determine citizenship. Congress provided that the Federal National Mortgage Association "shall maintain its principal office in the District of Columbia or the metropolitan area thereof and shall be deemed, for purposes of jurisdiction and venue in civil actions, to be a District of Columbia corporation." 12 U.S.C. § 1717(a)(2)(B). The citizenship here follows the principal place of business, but a specific statute is nevertheless necessary to provide the wiggle room of the "metropolitan area." The Student Loan Marketing Association,

25

meanwhile, "shall maintain its principal office in the District of Columbia and shall be deemed, for purposes of venue and jurisdiction in civil actions, to be a resident and citizen thereof." 20 U.S.C. § 1087-2(b)(1). Citizenship again follows the principal place of business, but the statute prevents the association from changing the locus of its operations. *See also* 47 U.S.C. § 614(b) (Telecommunications Development Fund); 49 U.S.C. § 24301(b) (Amtrak). These statutes presuppose that the principal place of business generally determines corporate citizenship.

### III

Even if I agreed that § 1332(c)(1) does not apply to a federally chartered corporation, I still would conclude that the factual allegations show that ACS is a citizen of the District of Columbia pursuant to the localization doctrine. [12] According to those allegations, the "principal place of business" of ACS is the District of Columbia: Its "major business activities" are conducted there and it maintains no "branch offices" elsewhere. *Waldron*, 1992 WL 81724, at *1-2 (identifying these factors as showing localization).

The majority refuses to apply the localization doctrine because Schneiderman did not rely on the doctrine before the district court. But that is again an incomplete picture. ACS first raised the objection that it has no citizenship under the diversity statute three years into

---

[12] *Cf. Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (explaining that the "party invoking federal jurisdiction" must establish the elements of jurisdiction "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation").

this litigation with three sentences in a third motion to dismiss.[13] Schneiderman explained in response that the federal courts have "carved out a 'localization exception' to the general rule established by *Bankers['] Trust*" under which "federally chartered corporations, whose operations were sufficiently confined to one state, could be deemed a citizen of a single state and could sue and be sued in Federal Court based on diversity."[14] He noted that "courts have held that particular federal corporations are sufficiently localized even though they conducted activities in several states."[15] And he observed that ACS lacks the "extensive nationwide operations" of large corporations and "has its principal place of business in Washington D.C." apart from chapters of the society located around the country.[16]

It is true that Schneiderman told the district court that he was not arguing that diversity jurisdiction existed based on a direct

---

[13] *See* Motion to Dismiss at 8, *Rumain v. Am. Chem. Soc'y*, No. 17-CV-2530 (E.D.N.Y. Dec. 18, 2020), ECF No. 62 ("In addition, ACS is a federally chartered corporation. Courts have consistently held that absent unusual circumstances, federally chartered corporations, such as ACS, are not citizens of a single state for diversity purposes. Accordingly, for these reasons, this Court does not have diversity jurisdiction over this action.") (citations omitted).

[14] Memorandum of Law in Opposition to Defendant's Motion to Dismiss the Third Amended Complaint at 20-21, *Rumain v. Am. Chem. Soc'y*, No. 17-CV-2530 (E.D.N.Y. Dec. 18, 2020), ECF No. 63 (citing *Elwert*, 138 F. Supp. at 400; *Feuchtwanger*, 272 F.2d at 455; *Loyola*, 58 F.3d at 606).

[15] *Id.* at 21 (citing *Sovereign Bank*, 2000 WL 1100800, at *1). He also noted that courts in this circuit have applied the localization doctrine. *See id.* (citing *Waldron*, 1992 WL 81724, at *1).

[16] *Id.* at 23-24; *see also id.* at 15 (stating that ACS has "citizenship in Washington D.C. where its headquarters and principal place of business is located").

application of the localization doctrine. Schneiderman instead argued that there is diversity jurisdiction because a different exception—analogous to the localization doctrine but based on the history and nonprofit status of ACS—applied.[17] While "courts normally decide only questions presented by the parties," *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (alteration omitted) (quoting *United States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987) (Arnold, J., concurring in the denial of rehearing en banc)), we are "not hidebound by the precise arguments of counsel," *id.* at 1581. We may consider "any argument in support of [a] claim … not limited to the precise arguments [the parties] made below." *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992).

An issue or a claim may be waived or forfeited, but "arguments or reasons supporting a properly preserved issue or claim are generally not waivable or forfeitable at all."[18] "When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction

---

[17] *See id.* at 22 ("Plaintiff is not arguing that The American Chemical Society falls under this exception. Rather Plaintiff maintains that this historical precedent shows that federal judges can properly take the initiative to broaden diversity jurisdiction over federally chartered corporations in warranted situations without specific statutory authorization from Congress. Thus, there is an established legal principle permitting this Court to rule in our case that this particular Congressionally Chartered Corporation, The American Chemical Society, should be subject to its diversity jurisdiction.") (emphasis omitted).

[18] Tyler B. Lindley, *The Structure of a Federal Appeal*, 79 Vand. L. Rev. (forthcoming 2027) (manuscript at 33), https://ssrn.com/abstract=6388239.

of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991).

The majority conflates the issue properly presented in this appeal—whether there is diversity jurisdiction over this dispute—with the particular arguments of the parties. But when an issue or claim is properly presented, we are not required to proceed "by deciding an effectively raised claim according to a truncated body of law." *Id.* at 100 n.5.[19] I would not resolve the issue of diversity jurisdiction by considering the diversity statute while ignoring the localization doctrine on which the diversity statute was built.

The majority invokes the distinction between waiver and forfeiture to suggest that we cannot consider the localization doctrine. *See ante* at 48. In doing so, the majority relies on cases holding that "[u]nder Fed. R. Crim. P. 52(b), this court has discretion to correct errors that were *forfeited* because not timely raised in the district court, but no such discretion applies when there has been true *waiver*." *United States v. Spruill*, 808 F.3d 585, 596 (2d Cir. 2015). That rule follows from the premise that "[m]ere forfeiture, as opposed to waiver, does not extinguish an 'error' under Rule 52(b)." *United States v. Olano*, 507 U.S. 725, 733 (1993). This case involves neither Rule 52(b) nor plain error review, so those cases do not directly apply.[20]

---

[19] *See also Lamar v. Micou*, 114 U.S. 218, 223 (1885) ("The law of any State of the Union, whether depending upon statutes or upon judicial opinions, is a matter of which the courts of the United States are bound to take judicial notice, without plea or proof.").

[20] In *Genesis Healthcare Corp. v. Symczyk*, the Supreme Court distinguished the jurisdictional *issues* of whether the plaintiff's individual claim was moot and whether the plaintiff's collective-action claims were moot. *See* 569 U.S.

Nevertheless, the "waiver/forfeiture distinction matters due to the party presentation principle" because "the Supreme Court has recognized a distinction between waived issues and forfeited issues." *United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022) (citing *Wood v. Milyard*, 566 U.S. 463, 470 n.4 (2012)); *cf. Genesis Healthcare*, 569 U.S. at 72 (noting that "even if the cross-petition rule did not apply, respondent's waiver of the issue would still prevent us from reaching it"). But as just explained, the localization doctrine is not a waived *issue* that we lack discretion to consider. If it were, then the scope of § 1332(c)(1)—to which the majority devotes so much attention— would also be a waived issue that the district court should not have addressed and that the majority should not address on appeal. *See Wood*, 566 U.S. at 472-73 ("It would be an abuse of discretion … for a court to override a … deliberate waiver.") (internal quotation marks omitted).

Just as Schneiderman told the district court that he was not relying on the localization doctrine, he said that he was not relying on § 1332(c)(1). Schneiderman said that "Plaintiff is *not seeking* a Court ruling applicable to all 'federally chartered corporations.'"[21] Instead, he argued that the district court should decide "only that diversity jurisdiction should apply to The American Chemical Society as a particular type of such corporation" based on "an entire line of precedent, which empowers this Court to act in areas *unaddressed directly* by Congress."[22] He expressly agreed that Congress "has *not*

---

66, 72-73 (2013). But this case involves the single issue of whether the court has diversity jurisdiction over the plaintiff's state-law claims.

[21] Memorandum of Law in Opposition to Defendant's Motion to Dismiss the Third Amended Complaint, *supra* note 14, at 3, 16 (emphasis added).

[22] *Id.* at 3, 19 (emphasis added).

*directly enacted a statute* recognizing that this category of federally chartered corporations should be subject to diversity jurisdiction, for example, by pegging their citizenship to their 'principal place of business'" as it had for state-chartered corporations, and therefore the diversity statute yields "different jurisdictional treatment of federally chartered and state-chartered corporations."[23] He argued that the district court should "take the initiative to broaden diversity jurisdiction over federally chartered corporations in warranted situations *without specific statutory authorization from Congress.*"[24] Schneiderman's memorandum in opposition to the motion to dismiss contains an extensive discussion of the localization doctrine, but it contains no argument that § 1332(c)(1) applies to this case—and in fact concedes that it does not—because Schneiderman intentionally relinquished that argument.

If Schneiderman's purported waiver of the localization doctrine precludes judicial consideration of whether ACS might be localized, then it was equally "an abuse of discretion" for the district court to "override" Schneiderman's "deliberate waiver" of the argument that § 1332(c)(1) applies by deciding whether the statute applies. *Wood*, 566 U.S. at 472-73 (quoting *Day v. McDonough*, 547 U.S. 198, 202 (2006)). All that would be left to do on appeal would be to identify the district court's abuse of discretion. But the majority proceeds to address the argument on the merits.

In my view, the majority's implicit conclusion that it may consider a waived argument that supports a preserved issue or claim is correct, and the majority's explicit conclusion that we may consider

---

[23] *Id.* at 19, 26 (emphasis added).

[24] *Id.* at 22 (emphasis modified).

§ 1332(c)(1) but not the localization doctrine is wrong. We may consider both arguments to resolve the issue of diversity jurisdiction.

I would do so. We might not have an "obligation to *find and exercise* subject-matter jurisdiction on a basis not raised by the parties." *Behrens v. JPMorgan Chase Bank, N.A.*, 96 F.4th 202, 207 (2d Cir. 2024). But here we need not engage in a search for jurisdiction because Schneiderman explained the localization doctrine to the district court and the allegations show that the doctrine applies. Even ACS agrees that the citizenship of a federally chartered corporation may be determined "by applying the 'localization' exception." Appellee's Br. 37. And the argument is closely related to the statutory question the majority addresses.

Given the general rule that we ought to exercise the jurisdiction we properly have, *see Bethlehem Contracting Co. v. Lehrer/McGovern, Inc.*, 800 F.2d 325, 327 (2d Cir. 1986), I would not make a discretionary decision to dismiss a case on the pretense that we lack jurisdiction when the record indicates that we have it. I would hold that Schneiderman has plausibly alleged that ACS is a citizen of the District of Columbia. Accordingly, there is "complete diversity of citizenship." *Carden v. Arkoma Assocs.*, 494 U.S. 185, 187 (1990) (internal quotation marks omitted) (citing *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267 (1806)). I would remand for the district court to determine whether the amount-in-controversy requirement is met.

\*     \*     \*

In this case, "even the most formidable argument concerning the statute's purposes could not overcome the clarity of the statute's text." *King v. Burwell*, 576 U.S. 473, 510 (2015) (Scalia, J., dissenting) (alteration omitted) (quoting *Kloeckner v. Solis*, 568 U.S. 41, 56 n.4

(2012)). The majority opinion has not overcome that clarity. Because I would apply § 1332(c)(1) as it was written, I dissent.